## LOUISVILLE CREDIT MEN'S ADJUST-MENT BUREAU v. UNITED STATES.

District Court, W. D. Kentucky.
Feb. 13, 1934.

Woodward, Hamilton & Hobson, of Louisville, Ky., for plaintiff.

T. J. Sparks, U. S. Atty., of Louisville, Ky., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and L. H. Baylies, Atty., Bureau of Internal Revenue, both of Washington, D. C., for the United States.

DAWSON, District Judge.

This is a suit for the refund of federal income taxes exacted of the plaintiff for each of the taxpayer's fiscal years ended April 30, 1926, to April 30, 1929, both inclusive. A somewhat detailed statement of the pertinent facts is deemed essential to a proper understanding and correct decision of the case.

The plaintiff, which will be called the bureau, was incorporated in 1907 with an authorized capital stock of 400 shares of the par value of $10 per share. Prior to 1922 only 180 shares had been issued, and in that year and prior to April 30th, 20 additional shares were issued. Since that date no additional shares have been issued.

The articles of incorporation provide that no stockholder may own more than 30 shares, and that all stockholders must be members of or persons connected with the Louisville Credit Men's Association, which is a nonprofit Kentucky corporation without capital stock, organized in 1902, and whose member-ship is composed of wholesalers, jobbers, manufacturers, and factories located in Louisville, Ky., and its vicinity. The articles of incorporation of this association declare: "The corporation will not carry on any business, but the objects or purposes to be transacted shall be all lawful and honorable measures for protecting manufacturers and wholesale dealers who sell on credit against needless losses, either by the dishonesty of their debtors or by unjust laws or practices."

Since its organization, in strict compliance with its articles of incorporation, it has not conducted any business, but has operated as a clearing house for credit information for its members and for the members of the National Association of Credit Men, with which it is affiliated, and for the members of other local credit men's associations affiliated with the National Association, and for the purpose of improving credit conditions generally. The only revenues the association receives, other than contributions from the bureau, are from the annual dues of members, and no dividends or other payments have ever been paid by the association to its members, and by the terms of its articles of incorporation no such dividends can be paid. On the other hand, the articles of incorporation of the bureau are frankly those of an ordinary business corporation. The articles, in part, declare:

"The nature and objects of the business will be the investigating or causing to be investigated, the financial condition of mercantile or other establishments, whether conducted by individuals, co-partnerships or corporations; to prevent loss on accounts against failing, insolvent or fraudulent debtors, as far as may be possible; to arrange for taking over stocks of merchandise and other property of debtors, whether real, personal or mixed by bill of sale, deed or otherwise, or acquiring a lien thereon, and the holding and disposing of the same for the benefit of creditors when the same may be deemed advisable; to secure concerted action in the nomination and election of efficient and trustworthy assignees, receivers, trustees in bankruptcy and other fiduciaries; to effect collections and transact such other business as may be germane to its objects and purposes; and to exercise such corporate powers as are usual and incident to business corporations."

From the date of its organization the bureau has engaged in all of the activities authorized by its charter, including the collection of delinquent accounts, administering insolvent estates, filing and attending to bank-

ruptcy claims, and such other business as is generally conducted by its individual and corporate competitors. These services are rendered to its stockholders, to members of the Louisville Credit Men's Association, to members of the National Association of Credit Men, and of its affiliates, and to nonmembers of these organizations. With some exceptions, not necessary here to mention, the bureau makes such charges for these services as to yield a profit, and it has always operated at a profit, and prior to 1925 contributed part of this profit to the support of the Louisville Credit Men's Association, which, prior to that date, was not self-sustaining.

The gross income of the bureau for the fiscal year ended April 30, 1918, was $11,172, and its net income $2,092, and at the end of that fiscal year it had a surplus of $3,244. For its fiscal year ended April 30, 1926, its gross income was $28,351, its net income $7,-383, and its surplus $12,529. For the fiscal year ended April 30, 1927, its gross income was $40,767, its net income $16,373, and its surplus $25,951. For its fiscal year ended April 30, 1928, its gross income was $43,202, its net income $12,256, and its surplus $38,-207. For its fiscal year ended April 30, 1929, its gross income was $52,872, its net income $15,071, and its accumulated surplus $48,164; while for its fiscal year ended April 30, 1930, its gross income was $59,916, its net income $18,502, and its accumulated surplus $66,796. The accumulated surplus represented, in large part, the net earnings of the bureau from its business activities authorized by its charter, after deducting a 10 per cent. dividend for each of the fiscal years ended April 30, 1918, to April 30, 1922, both inclusive, 175 per cent. dividend on February 1, 1923, donations to the Louisville Credit Men's Association of over $17,000 between 1918 and 1925, and taxes, including those sought to be recovered in this action.

The relations between the bureau and the Louisville Credit Men's Association from the beginning have been very intimate. They operate in the same suite of offices, many of the employees of the two companies being the same, each contributing on an agreed basis to the payment of their salaries. They have the same general manager, and the president of the association is always a member of the board of directors of the bureau. The business transacted by the plaintiff has, in large part, come to it from its stockholders, from the members of the Louisville Credit Men's Association, from members of the National Association of Credit Men and of its affiliated credit associations, and largely, if not solely, by reason of its connection with these credit associations.

Shortly prior to January 10, 1923, the officials of the National Association of Credit Men notified the bureau that if it wished to continue its close affiliation with the National Association and its affiliates, it must discontinue its policy of paying dividends to its stockholders. To meet this demand of the association, the board of directors of the bureau on January 10, 1923, amended the by-laws of the corporation. One of these amendments provided: "The corporation shall not operate for the profit of stockholders and no dividend shall be paid to stockholders under any circumstances; and any profits or earnings of the Bureau, not necessary for its successful operation, shall go to the Louisville Credit Men's Association."

Other amendments to the by-laws vest in the board of directors of the bureau power to determine the amount of surplus to be retained by the corporation for the operation of its business, and make provision for an annual audit and for furnishing a copy of such audit to the National Association of Credit Men. The board went on record at this meeting as desiring to meet all the requirements of the National Association, and approved the form of an agreement to be executed by the stockholders of the bureau, by which such stockholders agreed to place their stock in the hands of three trustees " * * * for the sole benefit of the Louisville Credit Men's Association, to be voted and possessed by said trustees for and during the period of ten years from and after January 1, 1923, and at the expiration of said voting trust all assets of the Bureau to be turned over to the Louisville Credit Men's Association."

The proposed trust agreement recited that it was executed to meet the policy of the National Association of Credit Men and of the Louisville Credit Men's Association not to co-operate with any adjustment bureau which paid dividends. Provision is made in the agreement for the president of the Louisville Credit Men's Association to fill any vacancies occurring in the trustee membership, and that the agreement may be terminated at any time by the unanimous consent of the signers. Two other very pertinent provisions of the trust agreement are as follows:

"(3) Each of the parties hereby agrees that if during said period of ten years either desires to sell or dispose of his shares of stock he will give notice in writing of such desire to each of the trustees, whereupon said trustees shall jointly have the option and right

to purchase the same within ten days after receipt of such notice for a price equal to the book value thereof at the time said notice is given, to-wit; that the proportionate value of the net assets of said corporation which the number of shares proposed to be sold bears to the entire issue of capital stock of said corporation but in determining the value nothing shall be included for good will and the property of the corporation shall be valued at its true value in money.

"(4) Any and all stock purchased under the provision of this agreement by the trustees shall be offered by them to the subscribers hereto at the purchase price thereof, it being the intent of this agreement to permit the signers hereto to acquire and hold by the trustees aforesaid the stock of any certificate holder who might insist on selling his stock."

This agreement was duly signed by the owners of all the outstanding stock of the bureau, except by the holder of one share, and since its execution no dividends have been paid to the stockholders.

Under these facts the plaintiff contends that it was and is a business league within the meaning of the applicable provisions of the Revenue Acts of 1926 and 1928, and exempt from income taxation under these statutes. The pertinent provisions of the two acts follow:

Revenue Act of 1926:

"Sec. 231. The following organizations shall be exempt from taxation under this chapter (Title III, Income Tax)—* * *

"(7) Business leagues, chambers of commerce, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private stockholder or individual." 26 USCA § 982 (7).

Revenue Act of 1928:

"Sec. 103. The following organizations shall be exempt from taxation under this title (Title I, Income Tax)— * * *

"(7) Business leagues, chambers of commerce, real estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private stockholder or individual." 26 USCA § 2103 (7).

Admittedly, plaintiff is neither a chamber of commerce, a real estate board, nor a board of trade, as these organizations are commonly understood and as these terms are used in the acts; but it is earnestly insisted that it is a "business league not organized for profit, and no part of the net earnings of

which inures to the benefit of any private stockholder or individual," within the meaning of the two Acts.

I cannot agree with this contention. It is quite clear that Congress, in addition to exempting from taxation the familiar chambers of commerce, boards of trade, and real estate boards, felt that there were other semi-public trade organizations performing a similar service which should be exempted, and, in searching for an all-embracing term by which such organizations might be designated, selected the words "business leagues" as a description of this class of organization, and in order to determine if a particular organization or corporation is embraced within this description it would seem to be a safe guide to see if such concern performs substantially the same functions as are customarily performed by boards of trade, chambers of commerce, or real estate boards. Chambers of commerce, boards of trade, and real estate boards in their respective fields all perform a function well known to the modern business world. They are not business concerns, in the sense that they operate for profit or render that individual paid service to the public, or even to their own members, that is customarily performed by individuals or organizations for the purpose of making money. Their function is a semi-civic one, having to do in large part with the general welfare of the business or businesses represented by their membership. In no sense are they individual business organizations operating for profit. Any surplus revenue realized over and above the actual cost of operation is the incidental, not the intended and planned, result of their operations. The revenues of such organizations are ordinarily obtained from membership dues—not from fixed charges for services rendered.

The plaintiff in this case meets none of these tests. Its charter is that of the ordinary private commercial corporation. It has capital stock. This stock has a par value. Under its charter the stock is entitled to dividends, if earned, and prior to 1923 dividends were earned and paid, and have been regularly earned since that date, but not distributed. It does not depend upon dues for its revenue. No dues are charged. The business in which it is engaged is that quite extensively engaged in by others for profit, and its earnings are acquired in exactly the same way as are the earnings of its competitors. To hold that Congress intended to exempt such an organization from taxation while taxing its individual and corporate competitors would convict

the legislative department of deliberate and unjust discrimination.

If we disregard the test of analogous activities, and measure the rights of the plaintiff by the plain language of the acts, it seems to me we must reject plaintiff's claim. To entitle a business league to exemption two conjunctive requirements must be met: First, it must not be organized for profit; and, second, no part of its net earnings must inure to the benefit of any private shareholder or individual. If it fails to meet both of these tests, it is not exempt. It was undoubtedly organized for profit, and it has continuously operated for profit, and has actually realized a profit every year of its operation. Its charges for services have always been fixed with the idea of realizing a profit. This alone would seem, under the language of the two statutes, to require the rejection of plaintiff's claim. Admittedly, prior to 1923 the net profits inured to the benefit of its stockholders, both in the form of dividends distributed and in the increase of their equity in the mounting surplus. Indeed, the corporate charter puts this fact beyond question.

It may well be doubted if, under the two revenue acts in question, a corporation possessing the corporate powers of the plaintiff, and conducting its business as has plaintiff, may, by a mere by-law eschewing profits and a contract of its stockholders among themselves, designed to carry such a by-law into effect, without a corresponding change in the corporate charter, transform a taxable corporation into an exempt one; but in any event it seems clear to me that no such result was attained by the plaintiff through the amended by-laws of January 10, 1923, and the trust agreement of the stockholders heretofore referred to.

As heretofore noted, one of the necessary requirements for exemption is that the corporation or business league be one not organized for profit. The statutes do not exempt a corporation merely because it is not organized or operated for the profit of its stockholders. If it is organized for profit, it is not exempt even though the profits are not for the stockholders, but solely for the corporation as such, or for some other person or organization. The by-laws of 1923 merely declare that the corporation shall not be operated *for the profit of the stockholders, and that no dividends shall be paid to the stockholders.* There is no change in the legal character of the corporation, nor in its authority to conduct its business for profit. As a matter of fact, it continued to operate for profit and continued

to make even greater profits than formerly and to pile up a fast growing surplus. Furthermore, the trust agreement is careful not to waive the rights of the stockholders to their equity in the surplus and other assets of the bureau, during the life of the agreement. On the eve of the execution of the trust agreement they distributed to themselves, through a dividend of 175 per cent., practically all the corporate assets then on hand, and by the terms of the agreement any stockholder was given the right to sell his stock, with the option to his associates to buy it for its book value, and the trust agreement at any time could be annulled by the unanimous consent of its signers. With these rights reserved to the stockholders, there can be no doubt that the net earnings of the bureau which found their way into surplus inured to the benefit of the stockholders during the life of the trust agreement, which, so far as the record discloses, was in full force during each of the years here involved. This fact, it seems to me, prevents the plaintiff from meeting the second requirement of the statute that no part of the net earnings shall inure to the benefit of private shareholders.

The trust agreement provides that at its termination all assets of the bureau shall be turned over to the Louisville Credit Men's Association, but this was certainly not binding on the nonsigning member. If binding on the others, it did not prevent them from selling their stock before the expiration of the trust agreement and thus getting the benefit of the net earnings which had at that time been carried to surplus. Furthermore, assuming that any of the net earnings not necessary for the business of the bureau were, as the amended by-laws of 1923 authorized, turned over to the Louisville Credit Men's Association (and between 1923 and 1925 some of the net earnings were so turned over), to this extent the net earnings of the bureau would seem to inure to the benefit of a private individual. I think it fair and reasonable to construe the words "private individual," as used in the two statutes, as broad enough to embrace private corporations, as well as natural persons. By the same token, to the extent that any net earnings were on hand as surplus at the expiration of the trust agreement and turned over to the association, as the agreement undertakes to provide, such net earnings would inure to the benefit of a private individual.

In view of all these considerations, I feel constrained to hold that plaintiff was not exempt under the statutes relied upon. I am fortified in the conclusion here reached by the

uniform definition given by the commissioner to the words "business league" and by the cases of Uniform Printing & Supply Co. v. Commissioner, 33 F.(2d) 445 (C. C. A. 7th Cir.), affirming the Board of Tax Appeals; Northwestern Jobbers Credit Bureau v. Commissioner, 37 F.(2d) 880 (C. C. A. 8th Cir.), affirming the Board of Tax Appeals (14 B. T. A. 362); and by the decision of the Board of Tax Appeals in the appeal of Adjustment Bureau of St. Louis Association of Credit Men v. Commissioner, 21 B. T. A. 232.

A finding of facts and judgment conforming to the views herein expressed may be prepared by counsel for the United States, and, after submitting same to counsel for the plaintiff, tendered for entry.