**AMERICAN FISHERMEN'S TUNA BOAT ASS'N v. ROGAN, United States Collector of Internal Revenue for Sixth Collection District of California.**

**Civ. No. 169.**

District Court, S. D. California, S. D.

July 13, 1943.

Gray, Cary, Ames & Driscoll and J. G. Driscoll, all of San Diego, Cal., for plaintiff.

Leo V. Silverstein, U. S. Atty., E. H. Mitchell, Asst. U. S. Atty., Edward J. O'Connor, Asst. U. S. Atty., and Eugene Harpole, Sp. Atty., Bureau of Internal Revenue, all of Los Angeles, Cal., for defendant.

HOLLZER, District Judge.

This is a suit to recover income and excess profits taxes paid by plaintiff for the years 1933 and 1936 to 1940, inclusive. It is asserted that these taxes have been

collected illegally and that refund thereof has been refused by the Commissioner of Internal Revenue.

As stated by counsel for the government, but one issue is involved. That question is whether during the years mentioned the activities of the plaintiff were of such a character as to constitute it an organization of the kind or type designated in the Revenue Acts as a business league.

The cause has been submitted solely upon the testimony of the president of the plaintiff, together with certain exhibits consisting of a list of plaintiff's membership and several photographs depicting activities pertaining to the tuna fishing industry.

Plaintiff is a voluntary unincorporated association, organized in 1930 and having a present membership of approximately sixty-six. This membership is held in the names of the tuna fishing boats, each boat having but a single vote, regardless of the number of individuals owning the vessel.

The Association's assets consist of a wooden frame structure located at the end of one of the municipal docks, together with necessary office furniture. This building is approximately 40x80 feet and is divided into two private offices, also a bookkeeping section and a meeting room. The Association is governed by a board of seven directors and its officers include a president, vice-president and a secretary-treasurer, all elected at the annual meetings of the membership. The latter officer assists part time in supervising the inspection of fish sold to the canners. In addition, an auditor or bookkeeper is employed. The Association has never declared a dividend, nor distributed any of its assets to its members. The funds with which it conducts its activities are derived exclusively from two sources, namely, annual membership dues of $10 per boat and contributions made on the basis of 60¢ per ton for all fish accepted by the canners.

The Association's activities have been confined practically entirely to the following lines of work during the past ten years. Through negotiations conducted by its representatives from time to time with representatives of the canners, standards for determining prices to be paid by the latter for the fish, as well as annual price schedules, have been established. Improved methods for conserving and preserving the fish after being caught have been devised.

This has included carrying on scientific research under the direction of the Hooper Foundation of the University of California and the Scripps Biological Institute. It has stimulated like studies on the part of the United States Pure Food and Drug Administration. It has also sponsored the study of refrigeration practices and the improvement of refrigeration machinery. Much of the cost of such research and study, excluding that conducted by the Federal Government, has been defrayed by the Association. Likewise, through its initiative and with its aid, in conjunction with services rendered by the California State Board of Health, fish inspection methods have been improved greatly and have been standardized. Representatives of the Association attend the negotiations conducted by boat owners with representatives of the crews and aid in setting up fair labor practices, including wage scales. Furthermore its officers have considerable to do in working out arrangements with the governments of Mexico and other Latin American countries with respect to fishing operations and bait privileges in the territorial waters of those nations. Again upon the initiative and through the efforts of the Association the practice has been established whereby the United States Coast Guard operates planes to transport injured fishermen from their boats to continental United States.

The work of the Association likewise has included initiating and aiding the studies conducted by the United States Tariff Commission between 1933 and 1936, which studies resulted in raising the tariff upon imported tuna sufficiently high to eliminate destructive foreign competition. Likewise it led the way in securing modifications in the regulations governing the type of equipment required for fishing boats, and also in the regulations defining the qualifications for officers on such boats. In addition, it has taken a leading part in securing the enactment of legislation designed to improve the fishing industry and has also aided greatly in opposing the passage of legislation which would be inimical to the public with respect to said industry. It has initiated efforts designed to secure, and has aided in bringing about, the adoption of practices in San Diego Harbor whereby facilities for anchorage, handling nets, etc., have been provided for fishing boats. Since our entry into World War II the Association has rendered considerable service to our naval officials, also

the United States Maritime Commission and to the OPA in arranging such matters as acquiring fishing boats for the Federal government, mapping out restricted fishing zones and thereby aiding in providing for the security of San Diego Harbor and the adjacent coast, and also advising with respect to regulations governing the rationing of fish. Furthermore it has initiated and assisted in the work of securing reasonably low insurance rates on fishing boats. It also has aided greatly in publicizing the tuna fishing industry and in promoting the interest of the general public therein. It is a member of and collaborates closely with the San Diego Chamber of Commerce and the California State Chamber of Commerce in carrying on much of its work. From time to time, in the event of a dispute arising between the owner of a boat and the members of the crew, the Association undertakes to mediate and adjust the differences.

The membership of the Association produces 80% of the tonnage of tuna fish sold to the canners in Southern California. The Association is the only organization in Southern California carrying on activities of the character herein described. However the aforementioned improvements, benefits and advantages thus gained through its initiative and with its assistance have not been restricted to its membership. On the contrary, all of these improvements, etc., have been enjoyed by the entire tuna fishing industry of Southern California, as well as large segments of the general public. Information respecting the industry is furnished to non-members when requested and without charge. Likewise other services are rendered gratis to non-members, often in the hope that thereby the latter will be induced to join the Association.

Up until about the year 1939 the tuna fishing business was the principal industry of San Diego and its environs. As the result of World War II it now ranks second to the airplane industry.

In addition to the activities heretofore mentioned, the Association through its bookkeeper prepares for the owners of ten or eleven boats statements of account with the canners. Tuna boats are operated on a profit-sharing basis, usually 45% to the crew and the balance to the boat, after deducting the expenses of the trip. Hence the preparation of such a settlement statement involves compiling the expenses of the trip, deducting the same and computing the amounts respectively payable to the crew and to the boat. These statements in turn are later used by the boat owners in preparing their income tax returns. However the Association neither prepares such returns nor makes any collections.

The testimony further showed that about one thousand fishermen are employed in fishing for tuna and about two thousand persons are employed in the tuna canneries.

Upon the foregoing facts—which in nowise are controverted—the sole question requiring determination is whether during the period involved the activities of the plaintiff were of such a character as to constitute the association a business league.

At the outset of the oral argument counsel for the government asserted that the facts upon which this determination must be made "are very, very close."

Referring to the pertinent language of the Revenue Acts and the regulations adopted pursuant thereto, government counsel added that while plaintiff has engaged in some civic activities and has done something for the promotion of the community that is for the advancement of business in the particular section where it operates, and hence meets some of the requirements necessary to qualify as a business league, nevertheless, in other and important particulars it has failed to do so. In support of the latter condition it is argued that the main purpose of plaintiff is to service its members, to protect their interests in dealing with the canners, especially in fixing prices for the fish sold to the latter. In other words it is contended that plaintiff has been organized for the sole purpose of improving the conditions of and protecting the boat owners, particularly in their dealings with the canners. Again it is urged that this association does nothing to advance the interests of the community or to improve the standards or conditions of the tuna fishing industry, but that its purpose is rather to provide a business economy or convenience for its members. Likewise, it is pointed out that by comparison with the large numbers employed as fishermen and the still greater numbers working in the fish canneries, plaintiff association represents and serves the interests of a very small fraction of those interested in the tuna fishing industry, and hence it does not perform any function which a Cham-

ber of Commerce should, and therefore cannot qualify as an organization engaged in improving the fishing industry in the community where it is located. Accordingly, for these reasons, counsel insists that the main activity of plaintiff has been to engage in a regular business of a kind ordinarily carried on for profit, and therefore it is not entitled to exemption from income tax.

In addition to quoting portions of section 103(7) of the Revenue Act of 1932, section 101(7) of Revenue Acts 1936, 1938, 26 U.S.C.A. Int.Rev.Code, § 101(7), and similar provisions of subsequent Revenue Acts, as well as the provisions of Section 19 of Treasury Regulation 103, Government counsel relies mainly on the cases of Louisville Credit Men's A. Bureau v. United States, D.C., 6 F.Supp. 196, and Produce Exchange Stock Clearing Ass'n v. Helvering, 2 Cir., 71 F.2d 142.

As pointed out by our 9th Circuit Court of Appeals in Retailers Credit Ass'n v. Commissioner of Internal Revenue, 90 F.2d 47, 111 A.L.R. 152, the provision of the regulations involved herein has been in force since the enactment of the Revenue Act of 1918, except for a minor modification which was in effect only from September, 1927 until February, 1929. Likewise there has been no material change in the legislation so far as the same is pertinent here. Both the statutes and the regulations have been frequently quoted in the reported decisions of various Federal courts and also in those rendered by the Board of Tax Appeals. Hence no essential purpose will be served by repeating such provisions, except to the extent that the same may be found quoted in some of these opinions.

■ It is axiomatic that a statute creating an exemption must be strictly construed, and that any doubt must be resolved in favor of the taxing power. It is equally well settled that each case must stand upon its own facts.

■ In the course of its opinion in Retailers Credit Ass'n v. Commissioner of Internal Rev., 9 Cir., 90 F.2d 47, page 50, 111 A.L.R. 152, the court said:

"Before discussing the purpose of an organization which is exempt we note a provision of the regulations stated 'It (a business league) is an organization of the same general class as a chamber of commerce or board of trade.' In Produce Exchange Stock Clearing Ass'n v. Helvering [2 Cir.], 71 F.2d 142, 144, it is said:

" 'Under the familiar doctrine of noscitur a sociis, a business league to be exempt must possess the general characteristics of these other organizations with which the statute groups it.' The characteristics of a chamber of commerce or board of trade here important are the purposes and operation thereof. The statute and regulations so construed mean, therefore, that the purposes of the league must be 'to promote such common interest,' must be similar to those 'of a chamber of commerce or board of trade' and must not be 'to engage in a regular business of a kind ordinarily carried on for profit.' "

Following the foregoing statement, the court pointed out that an examination of the taxpayer's articles of incorporation disclosed that one of its purposes was to promote the common business interests by various means. The opinion next set forth an approved definition of the term "chamber of commerce" and also an approved definition of the term "board of trade". Following this, the court stated it believed that the taxpayer "has purposes to advance and protect business interests, and therefore such purposes are similar to those of a board of trade."

■ The opinion next proceeds to consider the question whether an association, which in all other particulars conformed to the definition of a business league, was entitled to exemption from income tax if one of its purposes was to engage in a regular business of a kind ordinarily carried on for profit. In that connection the court referred to and analyzed the decisions in Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, 56 S.Ct. 285, 80 L.Ed. 278; Trinidad v. Sagrada Orden, etc., 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458; Crooks v. Kansas City Hay Dealers' Ass'n, 8 Cir., 37 F.2d 83; Northwestern Jobbers, etc. v. Commissioner, 8 Cir., 37 F.2d 880 and Produce Exchange, etc. v. Helvering, 2 Cir., 71 F.2d 142. Based upon such analysis, the court concluded that the proper interpretation to be given to the legislation and regulations involved is that, "if the purpose to engage in such a business is only incidental or subordinate to the main or principal purposes required by statute, then exemption cannot be denied on the ground that the purpose is to engage in such a business."

Since the rendition of the foregoing decision by the Ninth Circuit Court of Appeals, other cases dealing with the same question have been reported. Included among these have been Commissioner, etc. v. Chicago Graphic Arts, etc., 7 Cir., 128 F.2d 424, Retail Credit Ass'n, etc. v. United States D.C., 30 F.Supp. 855, King County Ins. Ass'n v. Commissioner, etc., 37 B.T.A. 288 and Oregon Casualty Ass'n v. Commissioner, etc., 37 B.T.A. 340. In all of these decisions, the taxpayer was found to be a business league and was held to be entitled to the exemption from taxation.

The first of the cases just cited arose upon a petition by the Commissioner of Internal Revenue to review a decision of the Board of Tax Appeals. In its opinion, the court there said in part (page 426 of 128 F.2d): "Our problem is to determine whether the respondent is a business league within the provisions of § 101(7) of the Revenue Act of 1936. * * *"

The court thereupon quoted pertinent excerpts from the statute and also from Article 101(7) of Treasury Regulation 94.

The opinion then continued as follows (pages 426, 427 of 128 F.2d):

"Petitioner, notwithstanding he concedes that the respondent is a business league in form, organized as a not-for-profit corporation, nevertheless contends that because the respondent conducted a cost accounting and estimating course and waste paper bureau, supplied a credit and employment service and received a percentage of the fees in connection with the litigation concerning the retailers' occupational tax, it was carrying on and was engaged in a regular business of a kind ordinarily carried on for profit. He argues that respondent's activities fall into three categories: (1) activities directed toward unity and cooperation within the industry; (2) the relations of the industry to the public, both of which he concedes improved the industry, but only in so far as the economically sound management of the individual firms resulted in a general improvement; and (3) the services rendered to individual members. He then argues that since exemptions are to be strictly construed, Helvering v. Northwest Steel Mills, 311 U.S. 46, 49, 61 S.Ct. 109, 85 L.Ed. 29, it follows that where part of the activities are outside of the scope of the exemption, exemption does not automatically arise from the mere preponderance of activities permitted by the statute. We think that Trinidad v. Sagrada Orden, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458; Crooks v. Kansas City, etc., Ass'n, 8 Cir., 37 F.2d 83; Santee Club v. White, 1 Cir., 87 F.2d 5; and Retailers Credit Ass'n v. Commissioner, 9 Cir., 90 F.2d 47, 111 A.L.R. 152, are helpful in guiding us to a conclusion.

"The statute as interpreted by the regulations says that the purpose of the business league must not be to engage in a regular business of a kind ordinarily carried on for profit. Where the business league has proper purposes without prohibited ones, then, if it operates in conformity to it, it is entitled to exemption. To come within the exemption, however, its activities must be directed to the improvement of business conditions or to the promotion of the general objects of one or more lines of business as distinguished from the performance of particular services for individual persons, but if the services are only incidental or subordinate to the main or principal purposes required by statute, then exemption cannot be denied on the ground that the purpose is to engage in a regular business of a kind ordinarily carried on for profit, Retailers Credit case, supra.

"The Trinidad case, supra, it is true, did not involve the statute now in question. It did, however, concern the interpretation of a tax exemption statute, whether the plaintiff was organized and operated exclusively for religious, charitable, scientific, or educational purposes. There, as here, it was contended that the plaintiff was operated also for business and commercial purposes in that it traded in wine and other articles. In holding the plaintiff exempt the court said (263 U.S. page 582, 44 S.Ct. [204], page 206, 68 L.Ed. 458): 'The articles are merely bought and supplied for use within the plaintiff's own organization and agencies,—some of them for strictly religious use, and the others for uses which are purely incidental to the work which the plaintiff is carrying on. That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed.'

"Crooks v. Kansas City Hay Dealers' Association, supra, was a suit to recover an income tax illegally collected. The plaintiff was a voluntary association of commission merchants buying and selling hay. Its object was fairly similar to that of the respondent in our case, that is, to promote sound business standards, the benefits to its members being incidental. It employed

938

men to inspect, weigh, and watch cars of hay, for which fees were exacted from the shippers and used for the purpose of paying its employees. The court held that the association was a business league and exempt from taxation. * * *

"In our case the Board found from all the evidence that the purposes of the respondent were to promote fairness, honesty, and better conditions in the graphic arts industry, that no cash dividend had been paid, that no special individual service was rendered by the respondent to its members without payment therefor adequately representing the cost of the service, and that any business in which respondent had engaged of a kind ordinarily carried on was only incidental or subordinate to its main or principal purpose, and concluded that respondent was a business league within the provisions of § 101(7) of the Revenue Act of 1936.

"These findings of fact the Board was free to make; they were warranted by the evidence and are binding upon us. Palmer v. Commissioner, 302 U.S. 63, 70, 58 S.Ct. 67, 82 L.Ed. 50; Helvering v. National Grocery Co., 304 U.S. 282, 294, 58 S.Ct. 932, 82 L.Ed. 1346; and Helvering v. Kehoe, 309 U.S. 277, 60 S.Ct. 549, 84 L.Ed. 751, and since the Board's decision is not based on an erroneous rule of law, it must be affirmed."

■ The reasoning of the courts as expressed in the opinions rendered in the cases previously cited, particularly in the decisions reported in 90 F.2d 47, 111 A.L.R. 152, and 128 F.2d 424, convince us that upon the record as herein presented the purposes and the activities of the plaintiff have been to promote fairness, honesty and better conditions in the tuna fishing industry, including improvement of business conditions of said industry, that no cash dividend has been paid, that no special individual service has been rendered by plaintiff to its membership except to a limited and minor extent, and then only upon payment therefor adequately representing the cost of the service, and that any business in which plaintiff has engaged of a kind ordinarily caried on for profit has been only incidental or subordinate to its main or principal purposes. Accordingly we conclude that plaintiff is and throughout the period involved herein has been a business league within the provisions of the applicable Revenue Acts.