**NATIONAL CHIROPRACTIC ASS'N, Inc. v. BIRMINGHAM et al.**

Civ. A. No. 608.

United States District Court
N. D. Iowa, W. D.

April 10, 1951.

Orville L. Dykstra, Walter R. Brown, Stratton R. Eller, Des Moines, Iowa, for plaintiff.

Tobias E. Diamond, U. S. Atty., Sioux City, Iowa, Paul S. McMahon, Sp. Asst. to Atty. Gen., for defendants.

GRAVEN, District Judge.

The plaintiff, National Chiropractic Association, is a Delaware corporation maintaining an office for the transaction of its business in Webster City, Iowa. Plaintiff brought this action against E. H. Birmingham, a resident of Sioux City, Woodbury County, Iowa, the duly qualified and acting Collector of Internal Revenue for the District of Iowa, to recover capital stock taxes, ad valorem penalties and interest which it claims were erroneously and illegally assessed and collected. E. H. Birmingham died November 18, 1950, and William E. Birmingham and Mildred L. Birmingham, the duly appointed executors of

his estate, were substituted as parties defendant.

Section 1200 of the Internal Revenue Code prior to its repeal by the Revenue Act of 1945 imposed a capital stock tax on corporations but Section 1201 of the Internal Revenue Code exempted therefrom all corporations exempt from income tax under Section 101 of the Internal Revenue Code. It is the contention of the plaintiff that it was exempt from income tax for the fiscal years ending June 30th from 1933 through 1945 by reason of Section 101(7) of the Internal Revenue Code which exempts business leagues from income taxation and therefore it is exempt from the capital stock tax for those years. In the latter part of 1944, or early in 1945, the Bureau of Internal Revenue indicated exception to the plaintiff's operation as a tax exempt organization. Plaintiff later filed capital stock tax returns for the years ended June 30, 1933, to June 30, 1945, inclusive, and claims for exemption from such tax based on the contention that it was an exempt organization. Thereafter, by letter dated October 21, 1947, the Commissioner of Internal Revenue rejected plaintiff's claims that it was exempt from capital stock tax and assessed the tax and penalties.

On or about February 12, 1948, plaintiff received a demand for payment of capital stock taxes from E. H. Birmingham in the amount of $1,531.25, with penalties in the amount of $382.83 and interest in the amount of $563.67, based upon the holding of the Commissioner of Internal Revenue that the plaintiff was not an organization exempt from federal income tax and, therefore, was not exempt from the capital stock tax. On February 25, 1948, and May 27, 1948, $2,101.92 and $304.33 respectively was paid to the Collector of Internal Revenue by the plaintiff in settlement of the demand received by the plaintiff on or about February 12, 1948. On or about May 6, 1948, plaintiff filed claims for refund which were rejected by the Commissioner of Internal Revenue by letter dated July 28, 1948. Thereafter, plaintiff instituted this action for the recovery of the tax, penalties and interest.

The plaintiff corporation, the National Chiropractic Association, was formed in 1930 by the amalgamation of the American Chiropractic Association and the Universal Chiropractic Association. Prior to 1930 both of these associations were national in scope and had similar objectives and purposes. The articles of incorporation of the National Chiropractic Association provide that the nature of the business of the corporation and the objects or purposes proposed to be transacted, promoted or carried on by it are as follows:

"To protect in every way not contrary to law, the philosophy, science and art of Chiropractic and the professional welfare of its members.

"To maintain the highest standards of morals and of practice in the Chiropractic profession.

"To secure for the Chiropractic profession that recognition to which its importance in the conservation of life and health justly entitles it. To protect Chiropractors from unjust attacks and unfair discrimination.

"To conduct research work and experiments with the view of advancing the profession.

"To gather and disseminate reliable information as to the exactness of its science, the truth of its philosophy and the benefits derived from the application of its art.

"To establish research, publicity, legal, legislative or other departments for the service of its members.

"To work unitedly for the enactment of statutes defining Chiropractic and legalizing its practice.

"To increase educational requirements for Chiropractors to the end that those practicing Chiropractic shall be eminently qualified by broad experience, technical knowledge and personal efficiency to uphold the dignity and honor of the profession.

"To establish a code of highest ethics for the regulation of the professional conduct of those practicing Chiropractic.

"To bring about a closer cooperation among Chiropractors, in every honorable

way to promote and protect the social, intellectual and professional welfare of every member of this corporation in particular, and of all members of the profession in general.

"To bring about a more general understanding of the true principles of Chiropractic and the benefits to be derived from their application.

"To familiarize the general public with Chiropractic as a means of removing the cause of human ailments and to secure the rights of the Chiropractors and their patients.

"In general, to promote the philosophy, science and art of Chiropractic.

"To do everything to bring about a complete development of Chiropractic.

"To advocate and encourage honest professional advertising and publicity.

"To effect the organization of Chiropractors in district and state organizations throughout the United States."

Dr. B. A. Sauer, former secretary of the American Chiropractic Association, was appointed executive secretary of the National Chiropractic Association upon its formation in 1930. The national office of the Association was located at Syracuse, New York, during Dr. Sauer's term as executive secretary. In 1932 Dr. Sauer resigned and Dr. Loran M. Rogers was appointed executive secretary. Dr. Rogers has served in this capacity from 1932 to the present. Upon Dr. Rogers appointment the national office was moved to Webster City, Iowa. Dr. Rogers testified that his predecessor had informed him that during the years in question the Association had operated under the assumption that it was exempt from income tax and therefore exempt from the capital stock tax.

At the time Dr. Rogers commenced his duties as executive secretary in 1932, the National Chiropractic Association had a membership of 848 out of a potential of approximately 20,000 chiropractors and was $18,000 in debt. At its inception the dues collected from the members were the only source of income. Subsequently some income has been derived from the publica-

tion and sale of the National Chiropractic Journal. In 1945 the plaintiff Association had approximately 6,800 members out of a potential of 20,000 and was in sound financial condition. In each of the years here in question the income of the plaintiff Association has exceeded the disbursements.

The by-laws of the plaintiff Association during the years here in question provided for several classes or types of memberships. Generally, these classes or types and the dues for each class or type were as follows: 1. the "General," "Associate," or "Public Health" membership, for qualified chiropractors desiring to be associated with the general activities of the National Chiropractic Association, the dues for which varied from $10 to $20; 2. the "Class A" membership for chiropractors licensed in the states in which they practiced, the dues for which were $40; 3. the "Class B" membership for chiropractors not licensed in the states in which they practiced, the dues for which were $60. For a period of time during the years here in question the dues of the Class A and B members were reduced to $35 and $55 per year respectively if they were members in good standing of an affiliated state chiropractic association. The Association also has usually provided for some type of membership at a reduced rate for students enrolled in chiropractic colleges.

A membership of any class in the National Chiropractic Association entitled the member to the literature published by the Association and the various other benefits extended. The Class A and B members were in addition eligible to receive payments from the Association to reimburse them for the expenses incurred in defending and paying judgments rendered in malpractice suits and resisting legal action for practicing medicine, surgery or osteopathy without a license. The by-laws of the Association were amended from time to time and there was some variation in the language used in the articles of the by-laws pertaining to the legal benefits extended to the members. Article X of the by-laws as revised August 15, 1939, is typical of the provisions relating to those benefits.

"Article X.
"Legal Benefits of Active
Membership.

"Section 1. The chief aim of the NCA is to promote the development of the philosophy, science and art of Chiropractic, and protect the welfare of its members in the practice of Chiropractic. To that end any active member who is wrongfully, unjustly or illegally prosecuted for practicing medicine, surgery or osteopathy without a license shall be defended by the legal department of the NCA. It will also defend any active member when sued for malpractice in the practice of Chiropractic.

"Section 2. The NCA will undertake to defend any active member when wrongfully, unjustly or illegally prosecuted for any offense immediately resulting from the practice of Chiropractic, providing, of course, that it can do so without violating any law.

"Section 3. When an action is commenced against any active member for practicing medicine, surgery or osteopathy without a license or for malpractice, or for any other offense immediately resulting from the practice of Chiropractic, such member shall, at his own expense, employ a competent local attorney to look after the case locally under the direction of the NCA legal counsel.

"Section 4. Any failure on the part of an active member, or of the local counsel, to comply with any of the foregoing requirements shall, at the option of the NCA, release it from all liability.

"Section 5. If an active member shall have been wrongfully, unjustly or illegally prosecuted for practicing medicine, surgery, or osteopathy without a license, and if he and his local attorney shall have both complied with the provisions of this Article, the NCA will reimburse him for fees paid to his local counsel for services in the case, not to exceed $50.00 in any one case or a number of cases tried at the same term of court, payment to be made after the case, or cases, shall have been tried. The NCA will also refund any taxable costs, or penalties, that he shall have been forced to pay; provided, of course, such reimbursements may be made without violating any law.

"Section 6. If an active member shall have been found guilty of malpractice in his practice of Chiropractic, and judgment shall have been rendered against him for damages, and he and his local attorney shall have complied with the provisions of these By-Laws, the NCA will reimburse him for the taxable costs and disbursements that he shall have been forced to pay, and also for any amount that he shall have been forced to pay on the judgment, not to exceed, in all, the sum of $5000.00 unless he did practice medicine, surgery or osteopathy, and provided, of course, that such reimbursements may be made without violating any law.

"Section 7. If any appeal to the Supreme Court, or other Appellate Court of last resort, is authorized by the NCA, the NCA will reimburse the active member for taxable costs and disbursements on appeal and also for a reasonable attorney's fee in such sum as the Executive Board may allow, provided, of course, that such reimbursement may be made without violating any law.

"Section 8. An active member under the influence of narcotics, or alcoholic or intoxicating drinks, shall not be reimbursed for any judgment rendered against him on account of acts committed while in such condition.

"Section 9. The foregoing legal benefits shall be available only to the active members who are in good standing and entitled to legal defense and malpractice benefits as hereinbefore stated. The Executive Board of Directors shall have the power to further define and limit the obligations of the Association in connection with legal defense and malpractice cases, subject to the approval of the House of Counselors at the next annual meeting."

In extending this protective benefit service it was the practice of the Association to advise its members to hire local counsel and defend any suit brought against them and upon culmination of the proceedings to present their claim to the Association.

Dr. Loran M. Rogers, the executive secretary, testified that some claims were denied, some paid in full and some paid in part.

In the early years of the Association the amount paid to chiropractors under this protective benefit service was largely determined by the amount of money in the treasury. Dr. Rogers testified that when the financial condition of the Association improved the executive board based their determination of whether the claim should be paid in full, in part, or denied upon the record of the chiropractor filing the claim and how important they thought it was that he be kept in practice in his community for the benefit of the public. The following table indicates the amounts paid out by the Association in claims and the percentage relation of these amounts to the total income of the plaintiff:

| Year | Total Cash Receipts | Paid Out in Members' Claims | Percent of Claims Paid to Cash Receipts |
|------|------|------|------|
| 1945 | $116,003.00 | $21,784.00 | 19 |
| 1944 | 102,310.00 | 15,666.00 | 15 |
| 1943 | 73,025.00 | 11,290.00 | 15 |
| 1942 | 72,010.00 | 7,828.00 | 11 |
| 1941 | 67,204.00 | 9,617.00 | 14 |
| 1940 | 66,077.00 | 13,881.00 | 21 |
| 1939 | 69,069.00 | 14,889.00 | 22 |
| 1938 | 61,491.00 | 14,984.00 | 24 |
| 1937 | 55,986.00 | 8,021.00 | 14 |
| 1936 | 47,166.00 | 3,796.00 | 8 |
| 1935 | 41,621.00 | 8,203.00 | 20 |
| 1934 | 35,940.00 | 5,443.00 | 15 |
| 1933 | 41,494.00 | 6,513.00 | 16 |

In 1932 the Association commenced publication of the National Chiropractic Journal and has subsequently undertaken the publication of another magazine named the Healthway Magazine. In addition to these activities plaintiff has engaged in public relations and educational activities and from 1939 to 1945 spent an average of 29.4% of its total income for these purposes. The plaintiff Association also accredits chiropractic schools which meet with its qualifications and has donated approximately $10,000 to educational institutions for research.

In 1939 the National Chiropractic Association adopted a school code which sets forth the qualifications a school must meet to become eligible for accreditation by the National Chiropractic Association. The Association employs a director of education, Dr. John J. Nugent, who inspects the chiropractic schools and assists them in maintaining and improving their curricula and facilities. To be accredited by the Association a school must have a standardized curricula teaching a four year course of not less than 4,000 hours and must be a nonprofit corporation owned and run by the profession. It is interesting to note that a bill has recently been passed by the 54th General Assembly of Iowa and signed by the governor increasing the educational requirements for a chiropractic license in Iowa to completion of a four year course of not less than 4,000 classroom hours in college. Senate File 96. Dr. Rogers testified that there are no accredited chiropractic schools in Iowa.

In 1946 the Association organized a separate corporation to take over its protective benefit service and to insure Class A and B members of the Association against attack from malpractice suits and legal action for practicing medicine, surgery or osteopathy without a license. The Association transferred $30,000 to the new corporation which is now operating as an insurance company under the name National Chiropractic Insurance Company. Upon the transfer of the function of protecting its members from malpractice suits and legal action for practicing medicine, surgery

and osteopathy without a license to the new corporation, the National Chiropractic Association decreased its membership dues to $20 per year for all classes of members. The new corporation makes a separate charge of $40 per year for the protection it extends. The determination as to whether a claim for contribution by a member is to be allowed or denied is no longer left to the discretion of the executive board of the Association. The new corporation is in all respects an insurance company and is a separate corporate entity from the plaintiff Association.

The plaintiff contends that it is exempt from the capital stock tax that was imposed in 1945 and prior years by Section 1200 of the Internal Revenue Code by reason of Section 1201 (also repealed by the Revenue Act of 1945) which stated "(a) The taxes imposed by section 1200 shall not apply—

"(1) Corporations exempt from income tax.

"To any corporation enumerated in section 101."

Section 101 exempts from income tax several types of organizations. The plaintiff at one time claimed exemption from the taxes in question under Section 101(3) of the Internal Revenue Code relating to fraternal beneficiary societies. The claim for exemption under that section was denied by the Treasury Department in a letter dated January 24, 1947, which reads in part as follows:

"* * * Section 101(3) of the Internal Revenue Code exempts from Federal income tax the following:

"'Fraternal beneficiary societies, orders or associations, (A) operating under the lodge system or for the exclusive benefit of the members of a fraternity itself operating under the lodge system; and (B) providing for the payment of life, sick, accident, or other benefits to the members of such society, order, or association or their dependents;'

"Section 29.101(3)–1 of Regulations 111 provides as follows:

"'A fraternal beneficiary society is exempt from tax only if operated under the "lodge system", or for the exclusive benefit of the member of a society so operating. "Operating under the lodge system" means carrying on its activities under a form of organization that comprises local branches, chartered by a parent organization and largely self-governing, called lodges, chapters, or the like. In order to be exempt it is also necessary that the society have an established system for the payment to its members or their dependents of life, sick, accident, or other benefits.'

"Inasmuch as you are not organized and operated under the lodge system, you are not entitled to exemption from Federal income tax under the provisions of section 101(3) of the Internal Revenue Code and corresponding provisions of prior revenue acts."

The plaintiff later claimed exemption from the taxes in question under Section 101(11) of the Internal Revenue Code. The claim for exemption under that section was denied by the Treasury Department in a letter dated September 3, 1947, which reads in part as follows:

"You now state that from May 31, 1932 to January 1, 1946 you were in fact a mutual insurance company, engaged in issuing insurance to your members against loss from casualty during that period, and that your income was used or held for the purpose of paying losses and expenses or returned to your members in services.

"Section 101(11) of the Internal Revenue Code provides for the exemption of:

"'Mutual insurance companies or associations other than life or marine (including interinsurers and reciprocal underwriters) if the gross amount received during the taxable year from interest, dividends, rents, and premiums (including deposits and assessments) does not exceed $75,000.'

"Corresponding provisions of prior revenue acts of section 101(11) of the Internal Revenue Code grants exemption to the following:

"'Farmers' or other mutual hail, cyclone, casualty, or other fire insurance companies or associations (including interinsurers and reciprocal underwriters) the income of which is used or held for the purpose of paying losses and expenses.'

"It is the opinion of this office that you are not exempt from Federal income tax under the provisions of section 101(11) of the Internal Revenue Code and corresponding provisions of prior revenue acts for the following reasons:

"1. Your articles of incorporation make no reference to an insurance company purpose.

"2. Your bylaws carry no provisions applicable to the operation and management of an insurance company.

"3. It does not appear that you are supervised in any way by state insurance company officials.

"4. There is no indication that you issue insurance contracts under which insureds may be indemnified with respect to losses arising out of the various risks specified in the contract."

The plaintiff presently claims exemption from the taxes in question under Section 101(7) of the Internal Revenue Code heretofore referred to. The claim for exemption under this section was denied by the Treasury Department in a letter dated January 24, 1947, which reads in part as follows:

"Section 101(7) of the Internal Revenue Code grants exemption to the following organizations:

" 'Business leagues, chambers of commerce, real-estate boards, or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual;'

"Section 29.101(7)–1 of Regulations 111 construing this provision of the Code defines a business league as an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining is not a business league.

"It is the opinion of this office that by maintaining a protective benefit fund for your members who were wrongfully, unjustly or illegally proceeded against for practicing medicine, surgery or osteopathy without a license, or who were sued for malpractice in the practice of chiropractic, you were performing particular services for individual persons. The providing of a protective benefit fund for your members, which accounted for approximately 63 percent of your average total income for the five preceding fiscal years ended May 31, 1945, cannot be considered an incidental activity, nor is such an activity a normal activity of a business league. * * *"

It is unnecessary to consider the subsections of Section 101 of the Internal Revenue Code under which plaintiff has previously claimed to be exempt since in the case at bar the plaintiff's only contention is that it is exempt under subsection 7 of Section 101. In order to establish its right to the exemption claimed under Section 101(7) of the Internal Revenue Code plaintiff must establish: (1) that it is a business league; (2) that it is not organized for profit; (3) that no part of its net earnings inure to the benefit of any private shareholder or individual. Northwestern Municipal Ass'n v. U. S., 8 Cir., 1938, 99 F.2d 460, 461. "To secure such exemption the taxpayer must not only carry whatever burden of proof the determination of the pending deficiency imposes, Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623, but must proceed perceptibly further and bring itself strictly within the provisions of the act creating the exemption. Central Co-operative Oil Ass'n v. Com'r, 32 B.T.A. 359, and cases cited therein." Retailer Credit Ass'n v. Com'r, 1936, 33 B.T.A. 1166.

It is the view of the Court that the plaintiff Association meets the first two requirements for the claimed exemption in that

it is a business league and is not organized for profit. The only question remaining therefore is whether any part of the net earnings of the plaintiff Association inured to the benefit of the individual members during the years in question.

■ Whether any part of the net earnings and profits inured to the benefit of any individual is a question of fact to be determined from the evidence. Crooks v. Kansas City Hay Dealers' Ass'n, 8 Cir., 1929, 37 F.2d 83; Com'r v. Chicago Graphic Arts Federation, 7 Cir., 1942, 128 F.2d 424. In considering this question it has been pointed out that distribution of dividends is not the only way profits may inure to the benefit of the members. Northwestern Municipal Ass'n v. U. S., 8 Cir., 1938, 99 F.2d 460. In Northwestern Jobbers' Credit Bureau v. Com'r, 8 Cir., 1930, 37 F.2d 880, the court defined "inure" as to serve to the use or benefit and held that by rendering services to the members the net profits inured to the benefit of the individual members of the credit bureau.

In the following cases it was held that the net earnings of the organization claiming to be exempt inured to the benefit of the private shareholders or individuals: Automotive Elec. Ass'n v. Com'r, 6 Cir., 1947, 168 F.2d 366; U. S. v. LaSociete Francaise De Bien. Mut., 9 Cir., 1946, 152 F.2d 243; Credit Mgrs. Ass'n v. Com'r, 9 Cir., 1945, 148 F.2d 41; Clay Sewer Pipe Ass'n v. Com'r, 3 Cir., 1943, 139 F.2d 130; Apartment Operations Ass'n v. Com'r, 1942, 46 B.T.A. 229, affirmed, 9 Cir., 1943, 136 F.2d 435; Underwriters' Laboratories, Inc. v. Com'r, 1942, 46 B.T.A. 464, affirmed, 7 Cir., 1943, 135 F.2d 371; Northwestern Municipal Ass'n v. U. S., D.C.Minn. 1938, 22 F. Supp. 18, affirmed, 8 Cir., 1938, 99 F.2d 460; Retailer Credit Ass'n of Alameda County v. Com'r, 9 Cir., 1937, 90 F.2d 47, 152 A.L.R. 152; Northwestern Jobbers' Credit Bureau, 1928, 14 B.T.A. 362, affirmed, 8 Cir., 1930, 37 F.2d 880; Uniform Printing & Supply Co. v. Com'r, 1927, 9 B.T.A. 251, 7 Cir., 1929, affirmed, 33 F.2d 445; Smith v. Reynolds, D.C.Minn.1942, 43 F.Supp. 510 (Organization providing medical and hospital benefits to railroad employees); Durham Merchants' Ass'n v. U. S., D.C.N.C.

1940, 34 F.Supp. 71; Louisville Credit Men's Adjustment Bureau v. U. S., D.C.Ky. 1934, 6 F.Supp. 196; Ft. Worth Grain & Cotton Ex. v. Com'r, 1933, 27 B.T.A. 983.

However, in the following cases it was held that the exemption claimed should not be denied on the ground that the net earnings inured to the benefit of private shareholders or individuals: Com'r v. Chicago Graphic Arts Federation, 7 Cir., 1942, 128 F.2d 424; Koon Kreek Klub v. Thomas, 5 Cir., 1939, 108 F.2d 616; U. S. v. Proprietors of Social Law Library, 1 Cir., 1939, 102 F.2d 481; Crooks v. Kansas City Hay Dealers' Ass'n, 8 Cir., 1929, 37 F.2d 83; Milwaukee Ass'n of Commerce v. U. S., D.C.Wis.1947, 72 F.Supp. 310; American Fisherman's Tuna Boat Ass'n v. Rogan, D.C.Cal.1943, 51 F.Supp. 933; Retail Credit Ass'n of Minneapolis v. U. S., D.C.Minn. 1938, 30 F.Supp. 855; Associated Industries of Cleveland v. Com'r, 1946, 7 T.C. 1449; Appeal of Waynesboro Manufacturers Ass'n, 1925, 1 B.T.A. 911. For a general discussion of exemptions under Section 101(7) of the Internal Revenue Code, see 111 A.L.R. 158, 152 A.L.R. 181; 8 A.L.R. 2d 939.

In the case at bar the defendant contends that by reimbursing the individual members of the Association for the expenses of litigation and by paying judgments rendered against the individual members in malpractice suits and suits for the unlawful practice of medicine, surgery or osteopathy, the net earnings of the plaintiff Association inured to the benefit of the individual members.

The plaintiff on the other hand contends that any benefit inuring to the individual members of the Association by reason of the maintenance of its protective benefit fund was incidental to the benefit to chiropractors in general or the public at large and thus the exemption should not be denied.

In the case at bar the reduction of the membership dues from $40 per year for Class A members and $60 per year for Class B members, both of which were eligible for the benefits of the protective fund, to $20 per year, the amount paid by members not entitled to the protective benefits,

when the Association transferred its protective functions to a separate corporation indicates that this phase of plaintiff's operations must have been more than incidentally benefiting the individual members whose dues were decreased. The additional $20 and $40 paid by the Class A and B members respectively, over and above the dues paid by members not entitled to protective benefits, could only have been a payment for a particular service or benefit the individual Class A and B members received.

The difference in the dues for the Class A and B members would seem to indicate that the Class B members were receiving more benefits than the Class A members. The provisions of the by-laws of the Association indicating the qualifications for each class of membership substantiates this view in that the Class B membership was limited to chiropractors practicing in states where they were not licensed to practice, while the Class A membership was limited to chiropractors practicing in states where they were licensed to practice. It would thus seem that the Class B members paid $20 more per year than the Class A members because they were more vulnerable to legal action for practicing medicine, surgery or osteopathy without a license than the Class A members.

In its brief and argument plaintiff contends that the main purpose of the Association was to promote the science of chiropractic. It then goes on and quotes the following passage from the opinion of the United States Court of Appeals for the Seventh Circuit in the case of Com'r v. Chicago Graphic Arts Federation, 7 Cir., 1942, 128 F.2d 424, 427: " 'Under the statute, in connection with the inquiry whether the net earnings of the organization claiming exemption as a business league inure to the benefit of private stockholders or individuals, especially where its activities are multifarious and for some of which it makes a charge and for others none, the court often considers which of its activities represents the main purpose of its operations and which are incidental thereto. If its main purpose is to benefit its shareholders or individuals it is not exempt. On the other hand, if benefit to the individuals is secondary and incidental, it is exempt.' " This quotation is from the opinion of the United States Court of Appeals for the Eighth Circuit in the case of Northwestern Municipal Ass'n v. U. S., 8 Cir., 1938, 99 F.2d 460, 463, in which the claim for exemption under Section 101(7) of the Internal Revenue Code was denied. In the case at bar even though the main purpose of the plaintiff Association was to promote the science of chiropractic or extend benefits to the chiropractors in general, it would seem that the benefit the individual members received was not of secondary or incidental importance to such members and the fact that the plaintiff required those members who were eligible to receive the legal protective benefits to pay substantially higher dues is indicative that the plaintiff did not regard such benefits as secondary and incidental.

The only evidence introduced by the plaintiff illustrating the benefit received by the chiropractors in general by reason of these legal benefits was the testimony of Dr. Rogers. Dr. Rogers testified that each chiropractor wanted the other to stay in business; that the chiropractors in general wanted to see a successful culmination of each case in order to remove any further hazard to the profession in general; and that chiropractors did not want other members of the profession sued for damages. The benefits described by Dr. Rogers that are received by chiropractors in general from the Association's reimbursement of a member for attorneys' fees and the expenses of litigation and payment of judgments rendered against a member are indirect and intangible at best, while the benefit to the individual Association member is direct, financial assistance. See, e. g., Consumer-Farmer Milk Co-op v. Com'r, 2 Cir., 1950, 186 F.2d 68, 71.

The plaintiff relies upon Com'r v. Chicago Graphic Arts Federation, 7 Cir., 1942, 128 F.2d 424 in urging that if the benefit to the members is incidental and secondary the exemption should not be denied on the ground that the net earnings inure to the benefit of the members. In that case however none of the operations of the Graphic Arts Federation resulted in direct benefit to

one member to the exclusion of all the other members as in the case at bar. Nor does it appear from the opinion that the Graphic Arts Federation differentiated between classes of members in regard to the services rendered and the charges to the members.

Plaintiff also relies upon the case of American Society of Cinematographers v. Com'r, 1940, 42 B.T.A. 675, in which the Society claimed exemption from income tax under Section 101(6). In order to be exempt under Section 101(6), as under Section 101(7), no part of the net earnings of the organization may inure to the benefit of any private shareholder or individual. The greater portion of the opinion in that case dealt with the question as to whether the Society constituted a "scientific" society within the provisions of that section. The Board of Tax Appeals held that it did. It appeared that the Society provided in their constitution and by-laws for an emergency fund from which benefits were paid to disabled members or to the beneficiaries of deceased members. This fund was created by special assessments of $10 per year for each member and in the event the fund became exhausted the constitution and by-laws provided that another assessment should be levied. The government raised the question as to whether or not the maintenance of such fund did not forfeit the claim for exemption. The Board of Tax Appeals stated that the Society acted merely as a trustee of the fund. It held that the operation of the emergency fund did not forfeit the claim of the Society to the exemption. The Board did not discuss whether the net earnings of the Society did inure to the benefit of the members. In the present case there is not present the feature of a separate, distinct and segregated fund held in the capacity of trustee.

It is the view of the Court that the Class A and Class B members of the plaintiff Association received individual services and benefits by reason of the payments they received to reimburse them for the expenses of litigation and to pay judgments rendered against them. The receipt of these benefits constituted an inurement of the net earnings of the National Chiropractic Association to the Class A and B members of the Association. Because the net earnings of the plaintiff did inure to the benefit of the individual members, the National Chiropractic Association was not exempt from income tax under Section 101(7) of the Internal Revenue Code during the years here in question and consequently was not exempt from capital stock tax under Section 1201 of the Internal Revenue Code. Judgment will, therefore, be entered in favor of the defendants.