**EVANSTON–NORTH SHORE BOARD OF REALTORS**

v.

**The UNITED STATES.**

No. 117–61.

United States Court of Claims.
July 12, 1963.

Rehearing Denied Oct. 11, 1963.

Theodore A. Groenke, Chicago, Ill., for plaintiff. Edward H. McDermott, Richard E. Murphy, Jr. and Frank M. Covey, Jr., Chicago, Ill., were on the briefs.

George Willi, Washington, D. C., with whom was Louis F. Oberdorfer, Asst. Atty. Gen., for defendant. Edward S.

Smith, Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the brief.

Before WHITAKER, Acting Chief Judge, REED, Justice (Ret.), sitting by designation, and LARAMORE, DURFEE and DAVIS, Judges.

REED, Justice (Ret.).

Plaintiff brings this action for an income tax refund for the fiscal year ending June 30, 1959. It claims that, as a real estate board, it is exempt from the payment of income taxes under § 501(c) (6) of the Internal Revenue Code of 1954, 26 U.S.C. § 501(c) (6) (1958 ed.), which confers an exemption upon:

> "(6) Business leagues, chambers of commerce, *real estate boards,* or boards of trade, not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual." (Emphasis added.)

The Evanston-North Shore Board of Realtors is an Illinois not-for-profit corporation whose 581 members consist primarily of licensed real estate brokers and salesmen in the Evanston and North Shore areas of suburban Chicago. The purposes of the Board, according to its Articles of Incorporation, are in part to maintain the responsibility of its members in their duty to the public, to enforce fair dealing, to foster fellowship among its members, and to support such governmental regulation as is designed to advance the interests of real property owners. The activities by which the Board strives to fulfill these ends include the operation of a member selection program to screen and educate new applicants for membership, the arbitration of disputes between members, the enforcement of a Code of Ethics promulgated by the National Association of Real Estate Boards, participation in the adoption and enforcement of local zoning ordinances and other municipal regulation of matters relating to real estate, and the support of various campaigns to maintain and improve our cities.

So long as these unquestionably were the primary activities of the Board, plaintiff's right to an exemption under § 501 (c) (6) was recognized by the Internal Revenue Service. However, in 1953 the Board, as have many other realty boards throughout the country, added to its activities the operation of a "Cooperative Listing Service," commonly termed a "multiple listing system" or "multiple listing service." In 1959, the Internal Revenue authorities issued Revenue Ruling 59–234, 1959–2 Cum.Bull. 149, in which it was concluded that a real estate board the primary purpose or activity of which is the operation of a multiple listing system, is not entitled to exempt status under the statute and the interpretative regulation; plaintiff subsequently was notified that its exemption was to be terminated as of June 30, 1958.

Plaintiff's challenge to the termination of its exemption rests on two grounds. First, it contests the basis of Revenue Ruling 59–234, and argues that a nonprofit corporation operating a multiple listing service as its primary activity is entitled to exemption under § 501(c) (6). Alternatively, plaintiff asserts that it should be tax free because the operation of its multiple listing service is not its primary activity but is only incidental to its other primary objectives.

A multiple listing system is a means by which the participating real estate dealers share listings which each has obtained for the sale of realty. Participation in the service operated by the plaintiff is mandatory for all Board members whose primary business is the sale of residential property. The operation of the plaintiff's system is more fully described in our Findings 28–33. It will do for these purposes to point out that when a real estate broker participating in the service enters a contract to act as agent for the sale of property, he forwards certain information regarding the property to the Board office; the Board duplicates this information and distributes it, together with a photograph of the property, to all other participating brokers. Thereafter, a date is arranged on which all

brokers may inspect the listed property. If a broker other than the listing broker effects the sale of the property, the commission is divided between him and the listing broker.

The listing service is financed in the following manner. In addition to a fixed monthly fee of $7 per member brokerage office, a listing broker is charged $10 each time he lists a piece of property. If he effects the sale himself, he is charged an additional $2; if a sale is effected cooperatively through another member broker, the listing broker pays the same additional $2, and the selling broker is also charged a $12 fee. The Board does not, however, segregate these funds from those which it obtains from other sources.

 Turning to the applicable provisions of law, section 501(c) (6) is set out above. The regulation to the statute further provides that in order for an organization to qualify for an exemption, its activities must be "directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons," and it must not "engage in a regular business of a kind ordinarily carried on for profit." [1] This regulation was first adopted in 1929, Treas.Reg. 74, Art. 528, shortly after

real estate boards had been added to the coverage of the statute, 45 Stat. 813, and the regulation has remained unchanged through repeated statutory reenactments. As both parties urge, the regulation must now be treated as having the force of law. Automotive Electric Assn. v. Commissioner, 168 F.2d 366, 367 (C.A. 6, 1948); Apartment Operations Assn. v. Commissioner, 136 F.2d 435 (C.A. 9, 1943); see Helvering v. Winmill, 305 U. S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52 (1938).

We may concede to the plaintiff that the operation of a multiple listing system is not a business which is normally carried on for profit. The Government argues to the contrary based on the fact that there are more than 100 multiple listing systems in the country which are organized as separate entities. But it does not follow that such organizations are operated for a profit. To the contrary, so far as appears, all of the independent systems are affiliated with and controlled by local real estate boards; none are privately owned corporations organized for profit. Plaintiff's right to an exemption cannot be defeated on this ground. Compare Oregon Casualty Assn. v. Commissioner, 37 B.T.A. 340 (1938), with Retailers Credit Assn. v. Commissioner, 90 F.2d 47 (C.A. 9, 1937).

---

1. Treas. Reg. 1.501(c) (6)–1:

"*Business leagues, chambers of commerce, real estate boards, and boards of trade.* A business league is an association of persons having some common business interest, the purpose of which is to promote such common business interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. An association engaged in fur-

nishing information to prospective investors, to enable them to make sound investments, is not a business league, since its activities do not further any common business interest, even though all of its income is devoted to the purpose stated. A stock or commodity exchange is not a business league, a chamber of commerce, or a board of trade within the meaning of section 501(c) (6) and is not exempt from tax. * * *"

There is no suggestion that these standards are not equally applicable to a real estate board. Indeed, the legislative history to the 1928 act, in which "real-estate boards" was added to the statute, suggests that the same standards were intended to apply to real estate boards as to the other organizations covered by the exemption provision. See Hearings before House Committee on Ways and Means on Revenue Revision 1927–28, Interim, 69th–70th Congresses, 235–238.

■ Nonetheless, if the multiple listing service is operated primarily for individual members as a convenience and economy in the conduct of their respective businesses, rather than for the improvement of business conditions within the real estate business generally, as was determined in Revenue Ruling 59–234, the operation of the service is not an activity warranting an exemption under the statute.

"The numerous subdivisions of * * [the predecessor to § 501] and the corresponding provisions in the earlier acts, specify organizations which, in the great majority of instances, are evidently granted exemption because of the benefit to be derived by the public from their activities. Cf. Trinidad v. Sagrada Orden, 263 U.S. 578, 581, 44 S.Ct. 204, 68 L.Ed. 458. There is reason why these should be favored, but none is apparent for exempting an association which merely serves each member as a convenience or economy in his business." Produce Exchange Stock Clearing Assn. v. Helvering, 71 F.2d 142, 143 (C.A. 2, 1934).

See Apartment Operations Assn. v. Commissioner, 136 F.2d 435, 436 (C.A. 9, 1943); Growers Cold Storage Co. v. Commissioner, 17 B.T.A. 1279, 1283 (1929).

To determine whether a multiple listing service is operated primarily for the benefit of individual realtors or for the benefit of real estate business generally is not without difficulty, since the interests of both and of the public as well are served by a system which facilitates the exchange of real property. Indeed, Revenue Ruling 59–234 is based upon the assumption that the purposes of a multiple listing service are:

"(a) to assist members of the board in rendering better service to the public by creating a broader and more active market for real estate; (b) to stimulate and facilitate the transaction of business between members of the board through cooperation and exchange of exclusive listings; (c) to provide a medium through which real estate may be merchandised more efficiently and expeditiously to the advantage of both buyer and seller; and (d) to encourage realtors to uphold high standards of business practice and to further educate them in adhering to the principles of the Realtors' Code of Ethics."

And a publication of the National Association of Real Estate Boards states simply that a multiple listing system is "a medium through which real estate may be merchandized efficiently and expeditiously to the advantage of the buyer and the seller and which will produce a greater profit to the Realtor." Moss, Multiple Listing Practice and Procedures 9 (Secretaries Council, National Association of Real Estate Boards, 1950).

Fortunately for the national welfare, though perhaps unfortunately for tax law, this is not an uncommon situation. The activities of many trade groups are of benefit to both the public and the trade in general, and to individual members of the trade. As the Tax Court noted in National Leather & Shoe Finders Assn. v. Commissioner, 9 T.C. 121, 126 (1947), "it can hardly be supposed that individuals would often join organizations without the expectation of receiving some personal benefits therefrom." Hence, the courts have often been called upon to determine whether the primary purpose and effect of an organization's activities is to benefit the group or the individual, and upon such a determination has hinged the fate of the exemption. Compare Automotive Electric Assn. v. Commissioner, 168 F.2d 366 (C.A. 6, 1948), with National Leather & Shoe Finders Assn. v. Commissioner, 9 T.C. 121 (1947).

■ In considering the facts of this case, we find several factors which require the conclusion that plaintiff's multiple listing system operates most immediately to the benefit of the individual participating realtors. First, and most important, is the fact that the fees charged for the listing service are in approximate proportion to the benefits

received by each realtor. A broker pays a fee for each piece of property which he lists, which listing is circulated to all other listing brokers, any of whom may sell the property and thus earn a commission for the listing broker. A like fee is paid by any other broker who is able to sell the property, and who thereby earns a commission on the sale. When each member contributes in proportion to what he receives, it is a strong indication that the benefits received are not, as plaintiff contends they are, "inherently group benefits." See National Chiropractic Assn. v. Birmingham, 96 F.Supp. 874 (N.D. Iowa, 1951); General Contractors' Assn. v. United States, 202 F.2d 633 (C.A. 7, 1953); Jockey Club v. United States, 137 F.Supp. 419, 133 Ct.Cl. 787, cert. denied, 352 U.S. 834, 77 S.Ct. 52, 1 L.Ed.2d 54 (1956); Credit Managers Assn. v. Commissioner, 148 F.2d 41 (C.A. 9, 1945); Durham Merchant's Assn. v. United States, 34 F.Supp. 71 (M.D.N.C., 1940); Fort Worth Grain & Cotton Exchange v. Commissioner, 27 B.T.A. 983 (1933); Growers Cold Storage Co. v. Commissioner, 17 B.T.A. 1279 (1929).

Second, there is also the consideration, upon which the Government places great stress, that participation in the multiple listing service is limited to members of the Board. This fact does provide some indication that the service is not designed to serve the real estate business generally, Park West-Riverside Associates v. Commissioner, P.H. B.T.A. Memo. Dec. ¶ 39,251 (1939), aff'd, 110 F.2d 1022 (C.A.2, 1940), although it may be that the limitation is best explained by the necessities of administering and enforcing the rules and procedures of the listing service. Moreover, to place too great reliance on this factor would confront taxpayers with a real dilemma. For if the service were made available to non-members of the Board, the inference would be available that the Board was seeking to earn profits from nonmembers which would inure indirectly to the benefit of its members, see American Automobile Assn. v. Commissioner, 19 T.C. 1146 (1953); Texas Mobile Home Assn. v. Commissioner, P.H. Memo. T.C. ¶ 62,-095 (1962), another ground upon which exemption could be denied.

Third, we take note of the manner in which the listing service has been regarded by the National Association of Real Estate Boards. In a brief filed with the Internal Revenue Service in October, 1956, by Mr. George Ellis, the Comptroller and Consultant for the National Association, speaking in part on plaintiff's behalf, it was conceded that "[t]he so-called multiple listing services operated outside and independent of a real estate board, are in fact, nothing more than a cooperative sales department of a purely business operation." See Finding 16. In a 1951 issue of the "Multiple Listing Digestaire" (see Finding 35), the National Chairman of Multiple Listing for the Secretaries Council reported:

"Never before in the history of selling has a selling service of this magnitude been offered to the property owner and from the experience of realty boards throughout the country which have used this same service. A great proportion of listings filed with the organization are sold. It is estimated that the average individual real estate broker cannot expect to sell more than 1% of the listings he receives; whereas this cooperative service has consistently been instrumental in selling 30–45% of the listings filed." Multiple Listing Digestaire 1 (3d Quarter, 1951).

An article in a later issue pointed out that multiple listing is not a perfect service, but "should be regarded as just one of the sales tools" in the realtor's office. Multiple Listing Digestaire 9 (Sept., 1952). Like additional statements could be extracted from the pages of the Digestaire, 19 issues of which were introduced in evidence in this case. Plaintiff of course is not bound by any such statements. Nevertheless, evidence that the industry itself regards the listing service as a "sales tool" at the disposal of the individual realtors is not without significance.

Finally, there is a particularly compelling analogy between the operation of a multiple listing service and of a stock or commodity exchange. Both are means of bringing buyers and sellers together to facilitate the sale of property. Both are supported by the brokers who earn commissions by arranging sales of the property. Both provide a genuine benefit to persons desirous of buying and selling property and to the brokers who deal in such property.[2] Since 1925 the regulations have expressly denied stock exchanges exempt status. T.D. 3746, IV-2 Cum.Bull. 77; see Treas.Reg. 1.501(c)(6)-1. And see Produce Exchange Stock Clearing Assn. v. Helvering, 71 F.2d 142 (C.A.2, 1934). We see no distinction between the exchange and the multiple listing service which would explain why the balance struck in the case of the former, in favor of taxability, should not govern in the case of the latter.

■ Hence, we sustain the determination of the Revenue Service that the operation of plaintiff's multiple listing system cannot be regarded as directed to the improvement of business conditions in the real estate market within the meaning of the regulations, but rather constitutes the performance of a particular service for brokers participating in the service.

■ Nonetheless, it is true that an organization whose principal purpose and activity is such as to justify exemption does not lose its exempt status by engaging in incidental activity which standing alone would be subject to taxation. Retailers Credit Assn. v. Commissioner, 90 F.2d 47 (C.A.9, 1937); Associated Industries of Cleveland v. Commissioner, 7 T.C. 1449, 1467 (1946); cf. Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458 (1924). Plaintiff's second contention is that it is entitled to an exemption for this reason—because the operation of its multiple listing system is only incidental to its other activities, which would otherwise entitle it to an exemption. However, the facts of this case do not permit such a conclusion.

In 1948 the plaintiff had one employee who was its executive secretary. At the time of the trial of this action, December 5, 1961, the plaintiff had five full-time employees and one part-time employee. It is a reasonable inference from the entire record that the increase in the number of employees was due in large measure to its operation of the multiple listing service. Of the Board's $94,652.77 gross income for the fiscal year ending in June, 1956,[3] $57,381.00, or 61% was derived from the operation of the multiple listing service. The Board's data does not permit precise allocation of the costs attributable to its multiple listing service and to its other activities; however, of total expenses of $76,654.70, $32,591.50 is directly allocable to the listing service, as is a substantial portion of $16,339.11 salaries expense. It would be reasonable to estimate that the listing

---

2. "This is why Exchanges exist, not only Stock Exchanges, but market-places of all kinds: Buyers seek the largest market they can get in order to obtain the lowest prices; sellers, in order to obtain the highest prices; and so it was learned long ago that economy of time and labor, as well as a theoretically perfect market, could be best secured by an organization under one roof of as many dealers in a commodity as could be found. Bear in mind that this result, moreover, is best accomplished when the organization is so controlled by rigid rules of business morality as to insure to every one who does business there, great and small, rich and poor, an absolutely square deal. In such a market every purchase is made with the most thorough acquaintance with the conditions involved. Each dealer, each broker, each speculator, strives to obtain the best knowledge of the supply and demand, and the earliest news that may affect it, and each buyer or seller has an equal and a fair opportunity to profit by the resultant effect on the market of all these various agencies. The larger the body of brokers and traders, then, the more accurate the standards of value thus created. It is a pity you could not have bought your piano under such conditions." Van Antwerp, The Stock Exchange from Within 6-7 (1913).

3. See Findings 14, 38.

service produced from $10,000 to $15,000 profit for the year, or from 27% to 40% of the Board's gross income from all sources other than the multiple listing service.[4] These figures would seem more nearly to indicate that the listing service is now the dominant, rather than an incidental, activity of the Evanston-North Shore Board.

Plaintiff asks that we disregard this data, however, and look instead to the overriding "purpose" of the Board to determine the significance of the multiple listing system in its over-all structure. Admittedly, there is considerable evidence in the record that the Board and its predecessor were formed for the purpose of eliminating abusive and unethical practices among local realtors and to promote what was considered to be healthy cooperation between the brokers. It is also true that in determining the relative importance of the activities of an organization so as to pass upon the application of the exemption statute, courts have often worded their analysis in terms of the purpose, or *raison d'etre*, of the organization. E. g., Associated Industries of Cleveland v. Commissioner, 7 T. C. 1449, 1467, 1468 (1946); National Leather & Shoe Finders Assn. v. Commissioner, 9 T.C. 121, 127 (1947). But these cases do not support the contention that a group's purpose can be disassociated from its activities. To the contrary, in Scripture Press Foundation v. United States, 152 Ct.Cl. 463, 285 F.2d 800 (1961), cert. denied, 368 U.S. 985, 82 S.Ct. 597, 7 L.Ed.2d 523 (1962), a religious publishing house claimed exemption under a related statute applying to organizations devoted to religious purposes;[5] the organization contended that

its fundamental objective was to stimulate the growth of Sunday schools in the United States, primarily by rendering free instructional services through its Instructional Department, rather than to earn profits. In rejecting the significance of this fact, Chief Judge Jones asserted the following for this court:

"We think that plaintiff's assertion that its instructional activities are more important to plaintiff than its selling activities is entirely sincere. The evidence in this case, as is amply borne out by the findings of the trial commissioner, shows that throughout its history Scripture Press has been led by people of devout and intense religious conviction. However, the intensity of the religious convictions of the plaintiff's members and officers cannot operate to exempt them from the tax law if the activities of the plaintiff cannot in themselves justify such an exemption. Piety is no defense to the assessments of the tax collector.

\* \* \* \* \* \*

"We think it is fair in making a determination as to what was the most important aspect of plaintiff's work to compare how much plaintiff accumulated as a result of its sales of religious literature and how much it expended for instructional activities." 152 Ct.Cl. at 470, 285 F.2d at 804.

The court went on to hold that "the enormity of the contrast between what plaintiff has accumulated from sales each year and what it has expended for its educational programs reveals that the sale of religious literature is its primary activity and that its instructional phase

---

4. See Finding 14. The Board's gross income from all sources other than the listing service was $37,271.17. If the profit from the listing service was $10,000, then the percentage was 27%; if $15,000.00, then 40%.

5. Internal Revenue Code of 1939 § 101(6), 26 U.S.C. § 101(6) (1952 ed.); now Internal Revenue Code of 1954 § 501(c)(3), 26 U.S.C. § 501(c)(3) (1958 ed.).

It is true that this provision probably imposes a more rigorous standard than § 501(c)(6), since it requires that the organization be operated "*exclusively* for religious \* \* \* purposes;" however, in holding that the activities of the organization rather than the convictions of its members must control, the court was referring only to the type of evidence that was relevant, and as to this the decision is apposite here.

is incidental thereto." In accord, see American Institute for Economic Research v. United States, Ct.Cl., 302 F.2d 934, cert. denied, 372 U.S. 976, 83 S.Ct. 1109, 10 L.Ed.2d 141 (1962); Consumer-Farmer Milk Cooperative v. Commissioner, 186 F.2d 68 (C.A.2, 1950), cert. denied, 341 U.S. 931, 71 S.Ct. 803, 95 L.Ed. 1360 (1951); Durham Merchant's Assn. v. United States, 34 F.Supp. 71 (M.D.N. C., 1940); Fort Worth Grain & Cotton Exchange v. Commissioner, 27 B.T.A. 983 (1933).

In seeking to minimize the importance of such financial data, plaintiff points out that in Milwaukee Assn. of Commerce v. United States, 72 F.Supp. 310 (E.D.Wis., 1947), an association which earned profits of $20,000 over a three year period from nonexempt activities was held exempt under the predecessor to § 501(c) (6). Plaintiff fails to point out, however, that the association also had other revenues of $337,734.19 for this same period. With better justification, plaintiff places reliance on Commissioner v. Chicago Graphic Arts Fed., 128 F.2d 424 (C.A.7, 1942), where for the tax years 1936 and 1937, the federation had received 40% and 34% of its revenues from nonexempt activities, but was nonetheless held entitled to exemption. However, in that case the relative importance of the nonexempt activities had steadily declined to 17% in 1939; more important, the court, though holding the nonexempt activities "incidental or subordinate to [the federation's] main or principal purpose," quoted from Northwestern Municipal Assn. v. United States, 99 F.2d 460, 463 (C.A.8, 1938), to the effect that in applying the exemption statute, "the court often considers which of its *activities represents the main purpose* of its operations and which are incidental thereto." 128 F.2d at 427. (Emphasis added.)

We do not say that financial data of the type here present is the only relevant criterion of the importance of one of an organization's many activities. But we do hold that the relative contribution to plaintiff's receipts and expenditures of

its listing service, and the amount of personnel which the service requires, are sufficiently substantial that the listing service cannot be regarded as an incidental activity of the Board.

It follows from what we have said that the plaintiff is entitled to no refund; its complaint is therefore dismissed.