ASSOCIATED MASTER BARBERS & BEAUTICIANS OF AMERICA, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2501–75, 604–77.    Filed October 20, 1977.

*William M. Claytor*, for the petitioner.
*Eric B. Jorgensen*, for the respondent.

DAWSON, *Judge:* In these consolidated cases respondent determined the following deficiencies in petitioner's Federal income taxes:

| TYE Sept. 30— | Deficiency | TYE Sept. 30— | Deficiency |
|---|---|---|---|
| 1967 | $7,789.25 | 1971 | 3,697.60 |
| 1970 | 591.96 | 1973 | 5,067.00 |

The issues presented for decision are (1) whether the petitioner qualified as an organization exempt from taxation under section 501(c)(6)[1] during the years in question and (2) if the petitioner was not exempt from taxation, whether it was a membership organization within the meaning of section 277, so as to prevent the carryback of its net operating loss incurred in its taxable year ended September 30, 1973, to its taxable years ended September 30, 1970, and September 30, 1971.

### FINDINGS OF FACT

Some of the facts are stipulated. The stipulation of facts and exhibits attached thereto incorporated herein by this reference.

Associated Master Barbers & Beauticians of America, Inc. (petitioner), is an Illinois corporation whose principal place of business and principal office was located at 219 Greenwich Road, Charlotte, N.C., when the petition was filed in this case.

For all times pertinent herein, the petitioner prepared its Return of Organization Exempt From Income Tax (Form 990) and kept its books and records on the accrual method of accounting. Petitioner's tax return (Form 990) for its taxable year ended September 30, 1967, was filed with the District Director of Internal Revenue at Greensboro, N. C. Petitioner's tax returns (Forms 990) for its taxable years ended September 30, 1968, September 30, 1969, September 30, 1970, September 30, 1971, September 30, 1972, and September 30, 1973, were filed with the Internal Revenue Service Center, Philadelphia, Pa. Petitioner filed an Exempt Organization Income Tax Return

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated.

(Form 990-T) for its taxable year ended September 30, 1971, with the Internal Revenue Service Center, Philadelphia, Pa.

Petitioner was incorporated on December 13, 1924, in the State of Illinois as a nonprofit organization with its headquarters in Chicago. In August 1967, it moved to its present headquarters located in Charlotte, N.C. From 1927 to the present, it has filed as a tax-exempt organization.

According to petitioner's articles of incorporation, the stated purpose for which petitioner was formed was "to found and conduct an association of Master Barbers for mutual co-operation in business and not for profit." In its original constitution and bylaws, adopted in November 1924, petitioner's purpose for organization was stated in the preamble as follows:

WHEREAS, The Master Barbers throughout America have never been organized as a body nationally, and,

WHEREAS, Their progress has been slow entirely from lack of unity and confidence in each other as workers, and,

WHEREAS, Unity guided by intelligence is a source of strength that can withstand all attacks, and that without intelligent organization we cannot acquire the advantages of standardization which will enable us to act together, for without organization we cannot concentrate our strength and direct our efforts toward the desired end, that we may elevate the standard of the Barber Profession.

THEREFORE, For the purpose of promoting such unity of sentiment and action among the Master Barbers throughout America, joining them closer together for united protection:

BE IT RESOLVED, That such an organization be created and known as the Associated Master Barbers of America.

On March 31, 1927, petitioner was originally determined by the respondent to be an organization exempt from tax under section 231(7), Revenue Act of 1926, now section 501(c)(6). This exempt status was subsequently reaffirmed on June 13, 1938, May 20, 1941, and December 16, 1944. On January 24, 1947, the petitioner's subordinate chapters were found to be exempt from tax under section 101(7), I.R.C. 1939, now section 501(c)(6). Their exempt status was subsequently reaffirmed in 1957, 1958, 1960, 1961, 1963, 1965, 1966, 1967, and 1976.

Respondent revoked the petitioner's exempt status by determination letter dated February 28, 1973. Its exempt status was revoked effective October 1, 1966. As of the present time, respondent has not revoked the exemptions for petitioner's subordinate chapters.

At various times during its existence the petitioner has instituted certain insurance programs and made them available to its members. At its national convention held in November 1927, the petitioner's members adopted a resolution establishing the basic death benefit plan, which became effective as of January 1, 1928. At its national convention held in 1931, the petitioner's members adopted a resolution establishing the basic sick benefit plan, which became effective as of January 1, 1932. A voluntary supplemental benefit plan, known as the blue plan, was initiated as of March 1, 1955.

During the period from October 1, 1966, through September 30, 1971, the petitioner administered and self-insured the death benefits and basic sick plans and the blue plan.

A new basic benefit program was approved by a referendum conducted with individual members and concluded August 15, 1972, providing death benefits as follows: through age 35, $3,000 in death benefits; ages 36 through 55, $2,000 in death benefits; ages 56 through 65, $1,000 in death benefits. Those members age 66 and above as of January 1, 1972, were eligible to receive any sick and death benefits according to the schedule of the old basic benefit program. The new basic benefit program was underwritten by Globe Life Insurance Co.

A major benefit program of insurance, underwritten by Zurich Insurance Co., was initiated as of July 1, 1967. It is a voluntary program for certain classes of the petitioner's membership. Petitioner annually receives a 1 dollar fee for administrative services from Zurich for each participating member.

In May 1959, a hospitalization insurance plan providing benefits of $100 per week, and in August 1959, a comprehensive hospitalization insurance plan, were initiated and underwritten by Craftsman Life Insurance Co. and later Hanover Insurance Co. which purchased Craftsman Life Insurance Co. The petitioner annually received a fee of 50 cents for administrative services from Craftsman and Hanover for each participating member. The fee received by petitioner was for in-house administrative services consisting of minor recordkeeping duties.

In 1964, malpractice and personal liability insurance underwritten by Lloyds of London and later by National Fire & Marine Insurance Co. of Omaha, Nebr., was initiated. It was discontinued around April 1975.

As of January 1970, the petitioner discontinued the monthly

publication of its magazine known as Master Barber and Beautician Magazine. The Professional Men's Hairstylist and Barber's Journal owned and published monthly by Service Publications became the petitioner's official journal in January 1970. Each month the magazine carries about 16 pages of news and information concerning and affecting the petitioner and its members. The journal also carries news and information concerning the barbering and beautician professions as a whole. Such information consists of general articles on hairstyling, hair and scalp care, shampooing methods, shaving techniques, hair coloring, hair piece design and placement, and shop management. In addition, the journal carries articles dealing with various benefits, goods, services, and insurance programs offered by the petitioner to its members. The petitioner received income from advertising for its magazine in the amounts of $17,803.09 and $4,532 for its taxable years ended September 30, 1967, and September 30, 1970, respectively.

The average total membership of the petitioner during its taxable years 1967, 1970, and 1971 was 9,041, 6,832, and 5,964, respectively. For each of its taxable years ended September 30, 1967, September 30, 1970, and September 30, 1971, the average number of petitioner's members by membership category was as follows:

|  | TYE Sept. 30— | | |
|  | 1967 | 1970 | 1971 |
|---|---|---|---|
| Sick and death benefit members | 6,971 | 5,010 | 4,366 |
| Nonbenefit members | 874 | 642 | 560 |
| Social benefit members | 532 | 564 | 532 |
| Class B benefit members | 549 | 343 | 286 |
| Home office members | 115 | 0 | 0 |
| Major medical benefit members (Zurich plan) | 0 | 273 | 220 |
| Total for year | 9,041 | 6,832 | 5,964 |

As of September 30, 1967, September 30, 1970, and September 30, 1971, the number of petitioner's members participating in the voluntary supplemental benefit plan (the blue plan) was 2,220, 941, and 960, respectively.

For its taxable years ended September 30, 1967, September 30, 1970, and September 30, 1971 the petitioner paid the following number of claims for benefits under the basic plan and voluntary supplemental benefit plan:

| | TYE Sept. 30— | | |
|---|---|---|---|
| | 1967 | 1970 | 1971 |
| Sick and death benefit members | 6,971 | 5,010 | 4,366 |
| Basic plan: | | | |
| Sick benefits | 499 | 396 | 359 |
| Death benefits | 97 | 101 | 94 |
| Voluntary Supplemental Plan: | | | |
| Sick benefits | 121 | 102 | 90 |
| Death benefits | 3 | 2 | 1 |

During the years in issue, petitioner's membership dues varied according to the membership classification or category of each member. For purposes of internal recordkeeping, dues were allocated to various funds, including the general and organizing fund, official journal, contingency fund, retirement compensation fund, sick and death benefit fund, home office dues, major benefit program, and supplemental benefit fund. The fund allocations included in petitioner's constitution and rule book for each year are for the purpose of internal fiscal budgeting of its operations. In practice, petitioner deposited all income from whatever source into one checking account. All expenses of petitioner were paid from that same account.

Dues allocated by petitioner for basic sick and death benefits for the taxable years ended September 30, 1967, September 30, 1970, September 30, 1971, and September 30, 1973, were in the amounts of $98,358.12, $80,279, $73,795, and $10,975, respectively.

Petitioner paid basic sick and death benefits as follows:

| | TYE Sept. 30— | | | |
|---|---|---|---|---|
| | 1967 | 1970 | 1971 | 1973 |
| Sick benefits paid | $37,233.85 | $33,068 | $29,765 | $6,188 |
| Death benefits paid | 44,450.00 | 48,529 | 44,363 | 28,203 |
| Totals | 81,683.85 | 81,597 | 74,128 | 34,391 |

Dues were allocated by petitioner to voluntary supplemental benefits for the taxable years ended September 30, 1967, September 30, 1970, September 30, 1971, and September 30, 1973, in the amounts of $17,518.20, $14,268, $13,605, and $11,574, respectively.

Petitioner paid voluntary supplemental sick and death benefits as follows:

| | TYE Sept. 30— | | | |
|---|---|---|---|---|
| | 1967 | 1970 | 1971 | 1973 |
| Sick benefits paid | $14,737.10 | $13,787 | $11,703 | $12,468 |
| Death benefits paid | 300.00 | 200 | 100 | 514 |
| Totals | 15,037.10 | 13,987 | 11,803 | 12,982 |

Dues were allocated by petitioner to general funds for the taxable years ended September 30, 1967, September 30, 1970, September 30, 1971, and September 30, 1973, in the amounts of $72,298.39, $113,771, $104,818, and $101,993, respectively. The hairstyling charts, beard charts, and carlow books are educational materials. Petitioner sold these materials to members and nonmembers alike.

Petitioner had sales of its standard textbook for barbers for its taxable years ended September 30, 1967, September 30, 1970, September 30, 1971, and September 30, 1973, in the respective amounts of $14,306.81, $8,595, $6,462, and $4,333. The textbook was sold to petitioner's members, nonmembers, barber schools, and beauty schools, and was designed for the purpose of educating those persons in the barbering and beautician professions in the techniques and methods of cutting, shaping, and styling hair, and also for the purpose of raising revenue for the organization.

Petitioner had sales of its styling book for its taxable years ended September 30, 1970, September 30, 1971, and September 30, 1973, in the amounts of $1,605, $1,514, and $970, respectively. The styling books constituted educational material offered for sale by petitioner to both members and nonmembers. Petitioner conducted styling courses during its taxable year ended September 30, 1971, and received $3,534 from such courses.

Petitioner had association jewelry sales for its taxable years ended September 30, 1970, September 30, 1971, and September 30, 1973, in the amounts of $490, $891, and $22, respectively. In addition, the petitioner received the amounts of $506, $205, and $848 from the sale of shop emblems during its taxable years ended September 30, 1970, 1971, and 1973, respectively. Sales of chapter supplies during the taxable years ended September 30, 1967, 1970, 1971, and 1973, were $1,604.75, $1,518, $1,010, and $840, respectively.

Petitioner received hospital insurance commissions in the amounts of $2,702.25 and $1,259 for its taxable years ended September 30, 1967, and September 30, 1970, respectively. For its taxable years ended September 30, 1970, September 30, 1971, and September 30, 1973, the petitioner received commissions or fees from the major benefit insurance program in the amounts of $2,708, $3,402, and $2,421, respectively, and from the new basic benefit program for its taxable year ended September 30, 1973,

in the amount of $3,655. These commissions were paid to petitioner for in-house administrative services performed by it.

Petitioner received commissions from the sale of hairstyling charges, beard charts, and carlow books in the amount of $208.14 for its taxable year ended September 30, 1967. Petitioner received commissions from the sale of hairstyling charts and beard charts for its taxable years ended September 30, 1970, September 30, 1971, and September 30, 1973, in the amounts of $161, $176, and $11, respectively.

Petitioner's constitution and rule books in effect during the years in issue provide that the national secretary-treasurer with the consent of the executive board shall invest the petitioner's funds in United States registered securities. As of September 30, 1967, 1970, 1971, and 1973, petitioner had investments in United States Savings Bonds or Treasury Notes in the amounts of $352,981.55, $381,246, $403,031, and $375,327, respectively. Petitioner realized interest income from its investments in United States Savings Bonds and Treasury Notes in the amounts of $12,906.75, $19,276, $24,823, and $23,067 for its taxable years ended September 30, 1967, 1970, 1971, and 1973, respectively.

Petitioner received from its members the amounts of $9,540 and $1,715 for its taxable years ended September 30, 1970, and September 30, 1971, respectively, for its retirement insurance program. When this program was terminated after being in existence for about 2 years, the premiums paid by petitioner's members were refunded in the amounts of $88 and $13,504 during its taxable years ended September 30, 1970, and September 30, 1971, respectively.

For its taxable years ended September 30, 1970, and September 30, 1973, the petitioner spent $5,763 and $281, respectively, on sending a styling team to the World Hairstyling Olympics. The World Hairstyling Olympics is held for the purpose of exchanging hairstyling techniques with professionals in foreign countries.

As of September 30, 1967, the balances of the basic sick and death benefits, voluntary supplemental benefits, and contingency reserve for sick and death benefits were $233,956.65, $58,505.85, and $48,493.13, respectively.

As of September 30, 1970, the balances of the basic sick and death benefits, voluntary supplemental benefits, and contingen-

cy reserve for sick and death benefits were $233,068, $64,163, and $43,310, respectively.

As of September 30, 1971, the balances of the basic sick and death benefits, voluntary supplemental benefits, and contingency reserve for sick and death benefits were $232,734, $65,965, and $43,365, respectively.

As of September 30, 1973, the balances of the basic sick and death benefits, voluntary supplemental benefits, basic benefit premium reserves, and contingency reserve for sick and death benefits were $183,606, $65,578, $5,206, and $46,657, respectively.

Petitioner is not a licensed insurance company under Federal or State law. Petitioner employs no insurance adjusters or salesmen. It does not rate its members by risk and does not have a separate insurance fund. It is not registered with the North Carolina Commissioner of Insurance.

The number of petitioner's active local chapters as of September 30, 1967, September 30, 1970, and September 30, 1971, was 379, 400, and 268, respectively.

## ULTIMATE FINDINGS OF FACT

(1) The substantial nature of petitioner's insurance programs resulted in it being engaged in a regular business of a kind ordinarily carried on for profit during the taxable years ended September 30, 1967, 1970, 1971, and 1973.

(2) During the years in issue relatively few of petitioner's activities were intended to promote and elevate the standards of the barber and beautician professions or were directed to the improvement of their business conditions.

(3) During the years in issue the petitioner was performing substantial and particular services for the benefit of its individual members by providing them with various types of insurance programs, goods, and services.

(4) During the taxable years ended September 30, 1967, 1970, 1971, and 1973, the petitioner did not qualify as a trade association or business league within the purview of section 501(c)(6) of the Code.

(5) During the taxable year ended September 30, 1973, the petitioner was a membership organization which was operated primarily to furnish services or goods to its members within the meaning of section 277 of the Code.

(6) Petitioner is not entitled to carry back a net operating loss

of $46,109.87 for its taxable year ended September 30, 1973, to its taxable years ended September 30, 1970, and September 30, 1971.

(7) Petitioner had taxable income of $23,064.89 for its taxable year ended September 30, 1973.

## OPINION

### Issue 1. Tax-Exempt Status Under Section 501(c)(6)

Section 501(c)(6) defines as tax-exempt organizations:

Business leagues, chambers of commerce, real-estate boards, boards of trade, or professional football leagues (whether or not administering a pension fund for football players), not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual.

Section 1.501(c)(6)–1, Income Tax Regs., provides:

A business league is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. It is an organization of the same general class as a chamber of commerce or board of trade. Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining, is not a business league. * * *

These regulations have remained basically unchanged for many years and have been held valid by various courts. *Northwestern Municipal Ass'n, Inc. v. United States*, 99 F.2d 460 (8th Cir. 1938); *Evanston-North Shore Board of Realtors v. United States*, 162 Ct. Cl. 682, 320 F.2d 375 (1963). They may be deemed to have been approved in effect by reenactment of the statutory exemption provision in the same terms since their adoption and permitting the administrative interpretation to become settled. *American Automobile Association v. Commissioner*, 19 T.C. 1146, 1158 (1953).

Petitioner has the burden of proving that it meets the requirements of the statute. *Helvering v. Taylor*, 293 U.S. 507 (1935); Rule 142, Tax Court Rules of Practice and Procedure. A statute creating an exemption must be strictly construed, and any doubt must be resolved in favor of the taxing power. *Sun-Herald Corp. v. Duggan*, 73 F.2d 298 (2d Cir. 1934); *Associated Industries of Cleveland v. Commissioner*, 7 T.C. 1449, 1464 (1946).

The essential requirements of an organization exempt under section 501(c)(6) were spelled out in *American Automobile Association v. Commissioner, supra* at 1158, as follows:

(1) It must be an association of persons having a common business interest.

(2) Its purpose must be to promote that common business interest.

(3) It must not be organized for profit.

(4) It should not be engaged in a regular business of a kind ordinarily conducted for a profit.

(5) Its activities should be directed toward the improvement of business conditions of one or more lines of business as opposed to the performance of particular services for individual persons.

(6) Its net earnings, if any, must not inure to the benefit of any private shareholder or individual.

Petitioner must meet each of these requirements in order to qualify as a tax-exempt business league.

Petitioner contends that it is exempt as a qualifying business league or trade association under section 501(c)(6) because it meets the necessary requirements. Respondent's position is that the petitioner fails to meet some of the definitional requirements of a section 501(c)(6) organization.

Petitioner was incorporated on December 13, 1924, in Illinois, as a nonprofit organization. According to its articles of incorporation, the purpose for which petitioner was formed was "to found and conduct an association of Master Barbers for mutual co-operation in business and not for profit." According to its constitution and rule book, petitioner's stated purpose for forming an association of master barbers is to establish common interests and promote the welfare of the profession and the public. More specifically, its purpose is:

1. To elevate our professional standards and implant among members of the profession and the public a higher appreciation of our profession and the services we render.

2. To broaden and professionalize our services, to promote the elevation and standardization of basic and advanced educational qualifications, and to assure opportunity for professional development through the establishment of an adequate income for services provided.

3. To promote an improved working relationship and mutual respect between the barber and beauty culture professions, to establish close cooperation between barbers and beauticians for the purpose of educating the public to a greater appreciation of our services, and to work for and bring about fair, uniform and non-conflicting laws governing the professions.

4. To promote and develop improved barber and beauty science techniques in advanced fields to ever increase and command public confidence, and to

advance scientific, technical and economic research in behalf of our profession, allied professions and affiliated industries.

5. To disseminate educational information and material through all forms of the communicating arts to the end that our profession may assume its rightful role in the community and in our national life.

6. To unify the allied professions through full exchange of information and to establish our profession and our allied professions as a vital force in the national economy.

Petitioner is clearly an association of persons having a common business interest. Members of the Associated Master Barbers & Beauticians of America, Inc., associate themselves in order to professionalize their services and ensure the establishment of an adequate income for services provided. The purpose for which petitioner was formed was to promote the common business interests of its members. That purpose was set forth in its constitution and rule book. In addition, petitioner was not organized for profit. It was incorporated in 1924 as a nonprofit organization. Its intention to operate as a nonprofit organization was stated in its articles of incorporation. Thus, the petitioner meets the first three requirements set out above.

The crux of respondent's position, however, is that the petitioner fails to meet the last three requirements. He contends that the services provided by the petitioner to both members and nonmembers were activities which are of a kind ordinarily carried on for profit. In particular, respondent points to petitioner's self-insurance programs and its involvement with the various insurance programs underwritten by independent insurance companies as evidence that it is engaged in a regular business of a kind ordinarily conducted for profit.

To the contrary, the petitioner maintains that the income from its insurance programs is related to the exempt function of its organization. Central to its position is that an association promotes the good of a profession as a whole when it provides proper protection and fringe benefits for the members of a profession who would otherwise not have any security, protection, or benefits. Thus the operation of an insurance program, argues petitioner, is related to the exempt purpose of the organization.

We agree with the respondent. Petitioner established a basic death benefit plan in 1928 and a basic sick benefit plan in 1932. In addition, a voluntary supplemental benefit plan was initiated in 1955. From October 1, 1966, to September 30, 1971, petitioner

administered and self-insured the basic sick and death benefit plans and the supplemental benefit plan. Its national officers and employees kept records on what insurance program each member participated in, processed claims for benefits, and paid benefits with respect to the numerous insurance programs provided by the petitioner.

A new basic benefit program, approved on August 15, 1972, was underwritten by Globe Life Insurance Co. Those members age 66 and above were not eligible for the new program. They continued to receive benefits under the old basic benefit program. Petitioner continued to operate and administer its self-insurance programs including the basic sick and death benefit plans for those members age 66 and above. In addition, Globe Life Insurance Co. required petitioner to collect premiums from its members, keep records of payments made, determine whether the insured was still a member, and process claims for benefits.

A large majority of petitioner's members participated in the self-insurance plans offered by petitioner. During the taxable year ended September 30, 1967, 6,971 of petitioner's 9,041 members participated in the sick and death benefit plans, while 2,220 participated in the voluntary supplemental benefit plan. During the taxable year ended September 30, 1970, 5,010 of petitioner's 6,832 members participated in the sick and death benefit plans, while 941 participated in the voluntary supplemental benefit plan. During the taxable year ended September 30, 1971, 4,366 of petitioner's 5,964 members participated in the sick and death benefit plans, while 960 participated in the voluntary supplemental benefit plan.

In addition, the number of claims processed by petitioner was substantial. During the taxable year ended September 30, 1967, it processed and paid 596 claims under the basic plan (sick and death) and 124 claims under the voluntary supplemental plan. During the taxable year ended September 30, 1970, it processed 497 claims under the basic plan and 104 claims under the voluntary supplemental plan. During the taxable year ended September 30, 1971, it processed 453 claims under the basic plan and 91 claims under the voluntary supplemental plan.

We think the evidence clearly demonstrates that petitioner was engaged in a regular business of a kind ordinarily carried on for profit during all the taxable years in question. Its officers and employees were involved on a daily basis with recordkeep-

ing, processing claims for benefits, paying claims, and performing other administrative duties in connection with such insurance activities. As we see it, the petitioner was engaging in an insurance business—a business of the type which is ordinarily carried on for profit.

Petitioner nevertheless contends that the income from its insurance programs is related to the exempt function of its organization. It cites several cases, including *Oklahoma Cattlemen's Association, Inc. v. United States*, 310 F.Supp. 320 (W.D. Okla. 1969), and *San Antonio District Dental Society v. United States*, 340 F.Supp. 11 (W.D. Tex. 1972), in support of its contention.

In the *Oklahoma Cattlemen's Association* case the taxpayer was organized to promote educational and scientific programs affecting the cattle industry of Oklahoma, to prevent cattle theft and control cattle diseases, to improve cattle breeding and, in general, to serve the mutual interests and common aims of the cattlemen of Oklahoma. The association also provided health, accident, and life insurance coverage to its self-employed members who would otherwise have had no opportunity to participate in such programs. In its opinion, the District Court said (310 F.Supp. at 323):

Making such insurance available to the membership is consistent with and substantially related to the stated purposes of the organization under the circumstances present, and, therefore, making the group insurance available to its members is related to its exempt purposes. * * *

We think the *Oklahoma Cattlemen's Association* case is clearly distinguishable from this case. The taxpayer there was an exempt organization under section 501(c)(5). The issue was whether payments received from an insurance company representing 5 percent of the premiums the company collected from the association's members constituted unrelated business income taxable under section 511; it was not whether the taxpayer's exemption should be revoked. Nor was the Oklahoma Cattlemen's Association operating any self-insurance programs. It was only passively involved and merely sponsored the program under its name. The degree of involvement by the taxpayer in the insurance programs is revealed in the District Court's opinion (310 F.Supp. at 322) follows:

The selling of insurance, the servicing of the policy, the collection of premiums and payment of claims, in short, everything connected with the insurance

program was wholly in the hands of the insurance company. The only significant participation of Plaintiff in the insurance program was that it was made available under its name to its members. Otherwise, Plaintiff was only passively involved. Thus, the activities of Plaintiff regarding the group insurance program by the common and generally accepted understanding of the terms cannot be considered a trade or business. * * *

In *San Antonio District Dental Society v. United States, supra,* the taxpayer was an exempt organization under section 501(c)(6). It entered into an agreement with a bank whereby the society sponsored a payment plan offered by the bank to members of the society requiring the member-dentists to pay into a special reserve fund of the bank 5 percent of their fees financed by the bank under the plan. The only source of funds deposited to the reserve fund was the payments from the membership of the society. Patients wishing to finance dental care signed notes payable to the dentists for the amount of their dental bills plus $6.50 per $100 per year as interest. The dentist was required to endorse the note back to the bank. The District Court, in its opinion, stated (340 F.Supp. at 15):

Making such payment plan available to the membership, and through the members, to the public is consistent with and substantially related to the stated purposes of the organization under the circumstances present and, therefore, making the payment plan available to its members is related to its exempt purposes. * * *

The *San Antonio District Dental Society* case is distinguishable from the instant case because it did not involve self-insurance programs. The issue in that case involved the taxability of unrelated business income under section 511, and did not involve the revocation of exempt status under section 501(c)(6).

In our judgment the petitioner herein is engaged in a regular business of a kind ordinarily carried on for profit, namely, the insurance business. However, it is true that an organization whose principal purpose and activity is such as to qualify for "business league" exemption does not lose its exempt status by engaging in incidental activities which standing alone would be subject to taxation. *Evanston-North Shore Board of Realtors v. United States,* 162 Ct. Cl. 682, 320 F.2d 375 (1963). It is therefore necessary for us to examine the extent of petitioner's insurance activities to see if they constitute only incidental, as opposed to substantial, activities.

Petitioner argues that the *time* which the employees of an

association devote to its various functions is a proper measure of "activity." See *Indiana Retail Hardware Association, Inc. v. United States,* 177 Ct. Cl. 288, 366 F.2d 998 (1966). It further argues that the evidence here shows that the time petitioner's employees devoted to its insurance activities was only 15 percent for the taxable years ended September 30, 1967, September 30, 1970, and September 30, 1971, and only 10 percent for the taxable year ended September 30, 1973. Thus, it is asserted that the insurance activities were only "incidental."

Respondent, on the other hand, contends that we should look to petitioner's *financial data,* such as its statement of receipts and disbursements for the taxable years at issue, to determine the extent of petitioner's insurance activities. See *Evanston-North Shore Board of Realtors v. United States, supra.*

During the taxable year ended September 30, 1967, receipts from the basic sick and death benefit funds and the voluntary supplemental benefit fund amounted to $115,876.32; and disbursements totaled $96,720.95. These amounts constituted 43 percent and 35 percent, respectively, of total receipts and total disbursements during that year. During the taxable year ended September 30, 1970, receipts and disbursements from the basic sick and death benefit funds and the voluntary supplemental benefit fund amounted to $94,547 and $95,584, respectively. These amounts constituted 31 percent and 30 percent, respectively, of total receipts and disbursements for that year. During the taxable year ended September 30, 1971, receipts and disbursements from the basic sick and death benefit funds and the voluntary supplemental benefit fund amounted to $87,400 and $85,931, respectively. These amounts constituted 31 percent and 32 percent, respectively, of total receipts and disbursements for that year. During the taxable year ended September 30, 1973, receipts and disbursements from the basic sick and death benefits funds and the voluntary supplemental benefit fund amounted to $22,549 and $47,363, respectively. These amounts constituted 11 percent and 21 percent, respectively, of total receipts and disbursements for that year.

While we think that both time and financial data should be considered in determining the extent of an organization's nonexempt activities, we view the petitioner's evidence, consisting of the testimony of Chris Hood, an employee, J. Nelson Snyder, a former employee, and Gerald St. Onge, petitioner's

national president at the time he testified, as having little probative value with regard to the percentage of time spent on the insurance programs. What is clear from the record is that numerous clerical duties had to be performed and voluminous records were kept on the petitioner's various insurance programs. Evidence as to the numerous records that had to be kept, the entries that had to be made on each record, and the processing of claims for benefits establishes to our satisfaction that a substantial amount of time was devoted to the insurance programs. The time spent, combined with the persuasive financial data available, convinces us that the petitioner's insurance activities were not merely incidental. They were substantial. Cf. *Santa Barbara Club v. Commissioner*, 68 T.C. 200, 206–207 (1977).

For these reasons we conclude that the petitioner failed to meet the fourth requirement necessary to qualify for exemption under section 501(c)(6). In our opinion it was engaging in a regular business of a kind ordinarily carried on for profit.

With respect to the fifth requirement for exemption, the record contains substantial evidence of the performance of "particular services" for individual persons and comparatively little evidence of activities designed to promote the hairstyling profession. In all of the years at issue the petitioner provided and offered numerous benefits to individual members in the form of various types of insurance, goods, and services. In addition to the self-insurance programs it administered and financed, the petitioner initiated a new basic benefit program in 1972 which was underwritten by Globe Life Insurance Co. In July 1967, the major benefit insurance program was initiated and underwritten by Zurich Insurance Co. This program provided, on a voluntary basis to the members, monthly disability income protection and death benefits. During the years at issue, the petitioner also offered a cancer insurance policy underwritten by an insurance company to its members; a malpractice and personal liability insurance policy underwritten by an insurance company; and a hospitalization insurance plan underwritten by Craftsman Life Insurance Co., and later, by Hanover Insurance Co. The petitioner also offered to its members a voluntary retirement insurance program which was in effect only during its taxable years ended September 30, 1970, and September 30, 1971.

Besides the numerous insurance programs, the petitioner

offered its members an eyeglass and prescription lens replacement service. It sold its local chapters certain supplies. It sold its members hair and beard styling charts, a "carlow book," style of the month binders, appointment books, and white nylon hair cloths. It sold its members shop emblems and association jewelry. It also sold a standard textbook and an examination for the textbook, as well as a special hairstyling book.

These insurance and other activities, which formed the bulk of the activities performed by petitioner during the years of issue, did not contribute to the improvement of business conditions in one or more lines of business as opposed to the performance of particular services for individuals. Consequently, we conclude that the petitioner has failed to satisfy the fifth requirement for exempt status under section 501(c)(6).[2] The record contains substantial evidence of activities of a type termed "particular services" by the regulations, but little evidence of activities designed to improve business conditions in the barbering and beautician professions. Because these activities serve as a convenience or economy to petitioner's members in the operation of their businesses, we think they constitute "particular services" as proscribed by the regulation. By providing insurance or textbooks for its members, the petitioner relieves its members of obtaining insurance or textbooks on an individual basis from a nonexempt commercial business. If the petitioner did not provide these goods and services, its individual members would have to obtain them from nonexempt businesses at a substantially increased cost. Thus, the organization is rendering "particular services" for the individual members as distinguished from an improvement of business conditions in the barbering and beautician professions generally.

Accordingly, we sustain respondent's determination revoking the exempt status of petitioner under section 501(c)(6) for the years at issue herein. The petitioner is taxable as a corporation under section 11 of the Code.

*Issue 2. Membership Organization Under Section 277*

Respondent audited the petitioner's taxable year ended

---

[2]Respondent also contends, in the alternative, that during the years at issue a part of petitioner's net earnings inured to the benefit of its individual members. In view of our disposition of the fourth and fifth requirements for exemption discussed previously, we need not consider this inurement question.

September 30, 1973, because the petitioner had filed as an exempt organization, even though its exemption had been previously revoked, and because the petitioner claimed a net operating loss carryback in the amount of $46,109.87 from that year to its taxable years ended September 30, 1970, and September 30, 1971. In his notice of deficiency respondent determined (1) that the petitioner was a membership organization within the meaning of section 277; (2) that the petitioner was not entitled to a net operating loss carryback, but could carry the net operating loss forward and apply it against membership income in the succeeding taxable years; and (3) that the petitioner had taxable income in the amount of $23,064.89 for its taxable year ended September 30, 1973, which resulted in the income tax deficiency of $5,067 for that taxable year.

Petitioner maintains that it is a trade association whose principal activities were to promote and elevate the standards of the barber and beautician professions and, therefore, it is not subject to the provisions of section 277.[3] Petitioner argues that the provisions of section 277 are not applicable unless it is found to be a membership organization whose *primary purpose* is to furnish services or goods to its members. Respondent counters with the contention that during the taxable year ended September 30, 1973, the petitioner was not only a membership organization, but also that it *operated primarily* to furnish services, insurance, and goods to its members, and that it used its taxable investment income to reduce the cost of services, insurance, and goods that it provided to its members. The petitioner's membership income derived from its dues is exceeded by the expenses of its membership activities. Its operating loss caused by its membership activities is offset by its taxable interest income realized from its investments in United States Savings Bonds

---

[3]SEC. 277. DEDUCTIONS INCURRED BY CERTAIN MEMBERSHIP ORGANIZATIONS IN TRANSACTIONS WITH MEMBERS.

(a) GENERAL RULE.—In the case of a social club or other membership organization which is operated primarily to furnish services or goods to members and which is not exempt from taxation, deductions for the taxable year attributable to furnishing services, insurance, goods, or other items of value to members shall be allowed only to the extent of income derived during such year from members or transactions with members (including income derived during such year from institutes and trade shows which are primarily for the education of members). If for any taxable year such deductions exceed such income, the excess shall be treated as a deduction attributable to furnishing services, insurance, goods, or other items of value to members paid or incurred in the succeeding taxable year. The deductions provided by sections 243, 244, and 245 (relating to dividends received by corporations) shall not be allowed to any organization to which this section applies for the taxable year.

and Treasury Notes and, as a result, the petitioner is not taxed on its investment income unless subject to the provisions of section 277. The legislative history of section 277 clearly reflects that the purpose of that section is to prevent nonmembership income or investment income of taxpayers like the petitioner from escaping taxation. This was stated in S. Rept. 91–552, 1969–3 C.B. 471, as follows:

In some cases, membership organizations, which also have business or investment income, serve their members at less than cost and offset this book loss against their business or investment income and as a result pay no income tax.

The reasons supporting the enactment of section 277 are set forth in the Summary of H.R. 13270 Tax Reform Act of 1969, prepared by the staffs of the Joint Committee on Internal Revenue Taxation and the Committee on Finance, 91st Cong., 1st Sess. 30:

(1) To permit a membership organization to offset investment or business income against a loss arising from services provided to members is the same as if an individual were allowed to offset his personal or recreational expenses against his investment income.

(2) This provision is necessary to prevent exempt membership organizations from attempting to avoid the effect of the unrelated business income rule by giving up their exempt status and deducting the cost of providing services for members from its investment or nonmembership income.

The provisions of section 277, as enacted, are explained in the General Explanation of the Tax Reform Act of 1969, prepared by the Joint Committee on Internal Revenue Taxation, 91st Cong., 2d Sess. 72, as follows:

The Act provides that in the case of a taxable membership organization, the deduction for expenses incurred in supplying services, facilities or goods to the members is to be allowed only to the extent of the income received from these members (including in this latter category income derived during the year from institutes and trade shows which are primarily for the education of members). The purpose is to prevent membership organizations from escaping tax on business or investment income by using this income to serve its members at less than cost and then deducting the "loss from the membership activity against the investment income."

Respondent determined the petitioner's net membership loss in the amount of $46,109.87 on Schedule B of the notice of deficiency as follows:

Membership income............................ $182,886.00
Membership deductions........................ 228,995.87

Net membership loss........................... (46,109.87)

Respondent determined the petitioner's nonmembership income in the amount of $23,064.89 on Schedule B of the notice of deficiency as follows:

Nonmembership income ...................... $351,702.00
Nonmembership deductions ................... 328,637.11

Net nonmembership income................... 23,064.89

As set forth in Schedule B of the notice of deficiency, nonmembership income is composed of interest income on the petitioner's investments,[4] magazine subscriptions from nonmembers, and the proceeds from the sale of petitioner's investments in United States Savings Bonds and Treasury Notes. The nonmembership deductions are composed of the petitioner's cost basis in its investments that were sold, i.e., United States Savings Bonds or Treasury Notes, less the capital loss it sustained on the sale of the investments and the applicable portion of the magazine's expenses to nonmember subscriptions. For the most part, the petitioner's net nonmembership income in the amount of $23,064.89 results from the petitioner's interest income on its investments in the amount of $22,525. Under section 277, a membership organization's taxable income consists of its net nonmembership income and its net membership income. Hence, the petitioner had taxable income for its taxable year ended September 30, 1973, in the amount of $23,064.89.

Petitioner also had a net membership loss in the amount of $46,109.87 for taxable year ended September 30, 1973. However,

---

[4]In *Shore Drive Apartments, Inc. v. United States*, 76–2 USTC par. 9808 (M.D. Fla. 1976), interest income from investments in United States obligations was held to be nonmembership income under sec. 277(a).

the legislative history of section 277 and the proposed Treasury Regulations[5] indicate that such loss does not qualify as a net operating loss as defined by section 172(c) of the Code. A net membership loss is to be treated as an item deduction attributable to membership activities in succeeding taxable years. This is reflected in the General Explanation of the Tax Reform Act of 1969, prepared by the Staff of the Joint Committee of Internal Revenue Taxation, 91st Cong., 2d Sess. at 72 as follows:

> The Act provides that where the cost of furnishing services, facilities or goods to members exceeds the income from members, the excess deductions are to be carried over to succeeding years and made available in those years as offsets against income derived from members in those years.

Consequently, the petitioner's net membership loss in the amount of $46,109.87 would be carried forward and applied against any net membership income that the petitioner had in its taxable year ended September 30, 1974, and succeeding years until used.

Petitioner is clearly a membership organization. Thus, the linchpin to the applicability of section 277 is whether the petitioner's principal activities during its taxable year ended September 30, 1973, were for the purpose of promoting and elevating the standards of the barber and beautician professions, as the petitioner maintains, or primarily to furnish services, insurance, and goods to petitioner's members, as the respondent contends.

We agree with the respondent. This is essentially a factual question. The evidence of record preponderates in favor of respondent's position. It establishes to our satisfaction that during the taxable year ended September 30, 1973, the petitioner was operated primarily to furnish services or goods to its members. Although the declared purpose of petitioner is to "establish common interests through united and coordinating activities" with continuing education as an important goal, the petitioner's priority and emphasis were directed toward providing services to its members. The information contained in several stipulated exhibits is revealing and illustrative of such priority. In a historical summary of petitioner's operations since its 1970 national convention in Los Angeles it is stated:

---

[5]See proposed sec. 1.277–1(e)(3), which was released on May 6, 1972, but has not been finally promulgated.

The main activities of this organization is [sic] to provide various benefits at reasonable costs to its members; benefits such as life insurance, loss of income ins., malpractice ins., hospitalization ins., credit unions, eyeglass and prescription lens replacement service, continuous educational programs, legislation, and various other general services, which may be found with such an association.

A rather colorful brochure entitled "The Parade of A.M.B.B.A. Benefits" describes numerous insurance benefits, services, and goods that the petitioner offers its members. Various editorials and advertisements from the petitioner's magazine for some years prior to 1973 promote the benefits in the form of insurance, services, and goods that petitioner provides to its members, not only as an encouragement to them to take advantage of such benefits but also as a lure for nonmembers to join petitioner. And even its application for membership form, printed in exhibit 37–AR, is very benefit oriented.

Accordingly, based upon the entire record, we hold that the petitioner was a membership organization operated primarily to furnish services and goods to its members during the taxable year ended September 30, 1973. Petitioner had taxable income for its taxable year ended September 30, 1973, in the amount of $23,064.89. It is not entitled to a net operating loss carryback of $46,109.87 to its taxable years ended September 30, 1970, and September 30, 1971.

Petitioner's claim for attorney's fees under Pub. L. 94–559 must be denied. See *Key Buick Co. v. Commissioner*, 68 T.C. 178 (1977), on appeal (5th Cir.).

To reflect the concessions of the parties and our conclusions on the disputed issues,

*Decisions will be entered under Rule 155.*